**Gregory C. MALLETT, Plaintiff–Appellant,**

v.

**WISCONSIN DIVISION OF VOCATIONAL REHABILITATION and Judy R. Norman–Nunnery, Defendants–Appellees.**

No. 94–2601.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 4, 1996.

Decided Dec. 1, 1997.

Sheri H. Mecklenburg (argued), Emlin Co., Bensenville, IL, for Gregory C. Mallett.

Michelle L. Ramirez, Nadim Sahar (argued), Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Wisconsin Div. of Vocational Rehabilitation.

Peter J. Cannon, Michelle L. Ramirez, Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Judy R. Norman–Nunnery.

Before CUMMINGS, COFFEY and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Gregory C. Mallett instituted this *pro se* action challenging the decision by the Wisconsin Division of Vocational Rehabilitation and its Administrator, Judy Norman–Nunnery, (collectively, "DVR"[1]) to close his file and discontinue the college tuition assistance that he had received under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.* The district court granted DVR's motion to dismiss for failure to state a claim. We affirm the district court's order for all but one claim. Mallett has a right under 42 U.S.C. § 1983 to challenge DVR's policy disfavoring funding graduate school education.

## I. HISTORY

The Rehabilitation Act seeks to provide handicapped individuals[2] with certain benefits and rights. The Rehabilitation Act breaks down into seven "Subchapters." Subchapter I, commonly known as "Title I," is labeled "Vocational Rehabilitation Services."[3] Specifically, Title I is intended to

> assist States in operating a comprehensive, coordinated, effective, efficient, and accountable program of vocational rehabilitation that is designed to assess, plan, develop, and provide vocational rehabilitation services for individuals with handicaps, consistent with their strengths, resources, priorities, concerns, abilities, and capabilities, so that such individuals may prepare for and engage in gainful employment.

29 U.S.C. § 720(a)(2). To that end, Congress created an interactive federal-state scheme whereby a state may receive federal funding for its vocational rehabilitation programs if it submits to the Commissioner of the Rehabilitation Services Administration a three-year plan which meets certain federal guidelines. Id. § 721(a). Wisconsin's legislature agreed "to accept the provisions of 29 U.S.C. §§ 701 to 796i, the [R]ehabilitation [A]ct of 1973 as amended, and the provisions of 34 C.F.R. 300 to 399 to carry out the purposes of the [A]ct." Wis. Stat. § 47.02(1). The State of Wisconsin designated DVR as its rehabilitation services agency.

Title I has thirty-six explicit requirements for state plans, one of which is an individualized written rehabilitation program ("IWRP"). *See* 29 U.S.C. § 721(a)(9). An eligible individual and his or her vocational rehabilitation counselor must jointly develop and agree to an IWRP. *See* id. § 722(b)(1)(A). Each IWRP must be designed to achieve that individual's employment objective, long-term rehabilitation goals, and intermediate rehabilitation objectives, "consistent with the unique strengths, resources, priorities, concerns, abilities, and capabilities, of the individual." Id. § 722(b)(1)(B)(i). The vocational rehabilitation services provided are "any goods or services necessary to render an individual with handicaps employable." Id. § 723(a). If a dispute arises between an individual and his counselor, the individual may exercise his right to an administrative appeal to a DVR supervisor, an impartial hearing officer, and finally DVR's Administrator. *See* id. § 722(d).

On August 15, 1984, DVR determined that Mallett was eligible to receive benefits under the Vocational Rehabilitation Program as a result of 1) shoulder and back injuries he sustained while employed at Briggs and Stratton Corporation and 2) several psychological disabilities discovered during Mallett's

---

1. Because the claims against the Division of Rehabilitation and Norman–Nunnery are nearly identical, we will address them collectively except where we note otherwise.

2. While it is usually unnecessary to note that we evaluate the statute as it existed when DVR closed Mallett's file, we do so in this case to explain why we use the term "handicapped individuals." In 1992, Congress amended the Act in part to replace the term "handicaps" with "a disability." *See, e.g.,* Pub.L. 102–569, § 123, 106 Stat. 4344, 4375 (1992).

3. Title I encompasses §§ 720–765.

medical evaluations. As a result of his injuries and disabilities, Mallett received book and tuition assistance for classes at the University of Wisconsin–Milwaukee. On March 20, 1989, DVR notified Mallett of its intention to close his file and discontinue his financial assistance. He claims DVR closed his file because he requested additional funds to attend law school.

Mallett then exercised his right to administrative appeals. *See* 29 U.S.C. § 722(d). First, he appealed this decision to DVR Supervisor Noreen Ryan, who upon review determined that Mallett's file was properly closed. Next, Mallett received a hearing before Impartial Hearing Officer Anne Walden Weiss. On December 28, 1989, Weiss provided a written affirmation of Ryan's decision. It stated that this was a "final decision of the designated State Unit under [34 C.F.R. § ] 361.48(c)(2)(v) unless the Administrator, Dr. Judy Norman–Nunnery, gives notice of intent to review the decision." On February 20, 1990, in response to a letter from Mallett, Norman–Nunnery declined to review the decision, describing it as "consistent and equitable."

Mallett then pursued judicial remedies *pro se*. On August 17, 1990, he filed a complaint in federal district court, which he amended on July 29, 1992. Mallett contends that DVR has violated his substantive and procedural rights under the Rehabilitation Act. Specifically, he argues: 1) that a DVR policy disfavoring funding graduate school education offends his right to an individualized rehabilitation plan under § 722(b); 2) that DVR failed to establish that he would be unable to meet his career goal in violation of § 722(c); and 3) that DVR did not provide proper administrative remedies by refusing his request to submit additional evidence in contravention of § 722(d). Title I, however, does not explicitly provide for a private right of action. Thus, Mallett asserts his claims under § 722, arguing it creates an implied private right of action; under 42 U.S.C. § 1983, arguing § 722 establishes enforceable rights; and under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, alleging that DVR discriminated against him because of his handicap.

On August 28, 1992, DVR filed a motion to dismiss Mallett's case for failure to state a claim, arguing in the alternative that the doctrine of immunity shielded it from suit or that Mallett had failed to state a claim as no private right of action exists for his claims. Pursuant to Fed.R.Civ.P. 12(b)(6), the district court granted DVR's motion to dismiss. The court concluded that Title I of the Rehabilitation Act does not contain a private right of action; that Title I does not confer enforceable "rights" under § 1983; and that a plaintiff may not assert a § 504 claim of discrimination against the state agency dedicated to aiding handicapped individuals for alleged violations of Title I.

## II. ANALYSIS

### A. Standard of Review

■ We review a district court's decision to grant a motion to dismiss under Rule 12(b)(6) *de novo*, accepting the well-pleaded allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. See *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir.1996). A dismissal under Rule 12(b)(6) is proper only where the plaintiff can prove no set of facts that would entitle him to relief. *See id.*; *see also Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Furthermore, we construe complaints drafted by *pro se* plaintiffs liberally. See *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 175–76, 66 L.Ed.2d 163 (1980); *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972).

### B. Implied Private Right of Action Under § 722

■ In the seminal case of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court identified four factors that courts should consider in determining whether an implied cause of action exists under a statute. They are: 1) whether the plaintiff is a member of the class for whose benefit the statute was enacted; 2) whether there is any indication of legislative intent to create or deny such a remedy; 3) whether an implied remedy is consistent with the underlying purposes of the statutory scheme; and 4) whether the cause of action is one traditionally relegated to the states so

that it would be inappropriate to infer a federal remedy. *See id.* at 78, 95 S.Ct. at 2087–88. The *Cort* approach, however, has fallen under severe criticism, and questions linger whether the four factor test remains a viable approach. See *Thompson v. Thompson,* 484 U.S. 174, 189, 108 S.Ct. 513, 521, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring in judgment) ("It could not be plainer that we effectively overruled the *Cort v. Ash* analysis . . . ."); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979) (refusing to afford the four factors equal weight and stressing that "the central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action"); *Cannon v. University of Chicago,* 441 U.S. 677, 731, 99 S.Ct. 1946, 1975, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting) ("The 'four factor' analysis of [*Cort*] is an open invitation to federal courts to legislate causes of action not authorized by Congress. It is an analysis not faithful to constitutional principles and should be rejected."). The Supreme Court has even questioned the approach lower courts have taken in establishing congressional intent. *See, e.g., Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 184–87, 114 S.Ct. 1439, 1451–53, 128 L.Ed.2d 119 (1994) (rejecting "broad-based notion[s] of congressional intent" derived from subsequent committee reports, congressional acquiescence to judicial interpretation through silence, and failed legislative proposals).

Although the Supreme Court has refused to overrule the *Cort v. Ash* test explicitly, the Court has retreated from it and has focused primarily on legislative intent, the second factor. *See Suter v. Artist M.,* 503 U.S. 347, 364, 112 S.Ct. 1360, 1370, 118 L.Ed.2d 1 (1992) ("The most important inquiry here . . . is whether Congress intended to create the private right sought by the plaintiffs."); *Karahalios v. National Fed'n of Fed. Employees,* 489 U.S. 527, 532, 109 S.Ct. 1282, 1286, 103 L.Ed.2d 539 (1989) ("The 'ultimate issue is whether Congress intended to create a private cause of action.'") (quoting *California v. Sierra Club,* 451 U.S. 287, 293, 101 S.Ct. 1775, 1778–79, 68 L.Ed.2d 101 (1981)); *Thompson,* 484 U.S. at 179, 108 S.Ct. at 516 ("In determining whether to infer a private

cause of action from a federal statute, our focal point is Congress' intent in enacting the statute."); *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979) ("[W]hat must ultimately be determined is whether Congress intended to create the private remedy asserted."); *Touche Ross,* 442 U.S. at 568, 99 S.Ct. at 2485 ("[O]ur task is limited solely to determining whether Congress intended to create the private right of action asserted. . . .").

■ Given this evolution in thinking about implied rights of action, our inquiry is whether Congress intended an implied right of action under Title I in light of the statute's language, structure, and legislative history. If such inferences of intent are not present, we must conclude that "'the essential predicate for implication of a private remedy'" does not exist. *Thompson,* 484 U.S. at 179, 108 S.Ct. at 516 (quoting *Northwest Airlines, Inc. v. Transport Workers Union of America,* 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981)). "Courts seldom imply a private right of action where none appears in the statute, for 'a strong presumption exists against [their] creation. . . .'" *Statland v. American Airlines, Inc.,* 998 F.2d 539, 540 (7th Cir.1993) (quoting *West Allis Mem'l Hosp., Inc. v. Bowen,* 852 F.2d 251, 254 (7th Cir.1988)); *see also Louisiana Landmarks Soc'y, Inc. v. City of New Orleans,* 85 F.3d 1119, 1123 (5th Cir.1996) (recognizing this presumption); *Stowell v. Ives,* 976 F.2d 65, 70 n. 5 (1st Cir.1992) (same). Without evidence of congressional intent to imply a private right of action, we will not address the remaining *Cort* factors because the plaintiff will have failed to show any ability to shift the presumption against its creation.

Mallett contends that there is a private right of action implied in § 722 to challenge whether he has received an appropriate IWRP and whether DVR properly heard his administrative appeals. Congress, however, has provided only administrative remedies for dissatisfied individuals. Section 722(d) allows an unsatisfied handicapped individual to appeal an IWRP in the event that the individual and the vocational rehabilitation counselor cannot agree. Specifically, a hand-

icapped individual has the right to: 1) have an impartial hearing officer review his claims, 2) request the Director/Administrator of the program to review the impartial hearing officer's decision, and 3) submit additional evidence to both the impartial hearing officer and the program Director/Administrator. 29 U.S.C. § 722(d). Title I does not expressly provide a right of action for Mallett's claims; nor does it give any indication of an implied one.

The process by which Congress established these administrative procedures also suggests an intention not to include a judicial remedy. Congress introduced administrative remedies as part of the 1978 Amendments to the Act. Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub.L. 95–602, § 103(2), 92 Stat. 2955. The Senate's version of this amendment contained both administrative remedies and "a subsequent civil action for such relief (with the exception of monetary damages) as the court may determine is appropriate." H.R. Conf. Rep. No. 95–1780, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.C.C.A.N. 7312, 7375, 7379. The House version did not contain any review procedures. *See id.* As a compromise, the conference committee agreed to the administrative remedies but rejected the private right of action. *See id.* at 7379–80; *see also Ryans v. New Jersey Comm'n for the Blind and Visually Impaired,* 542 F.Supp. 841, 845–46 (D.N.J.1982). It is possible, therefore, to infer a rejection of a private right of action from this compromise.

Also, § 721(d)(1)[4] is helpful in determining whether Congress likely intended to provide an implied right of action under § 722. Section 721(d)(1) provides that "[a]ny State which is dissatisfied with a final determination ... may file a petition for *judicial review* ... in the United States Court of Appeals for the circuit in which the State is located." 29 U.S.C. § 721(d)(1) (repealed 1992) (emphasis added). Thus, § 721(d)(1),

unlike § 722(d), *expressly* provides for a judicial right of action but only for the state.

The existence of § 721(d)(1) suggests that a version of the maxim *expressio unius est exclusio alterius* may apply. While courts have been reluctant to rely on this canon of statutory construction in other areas, they have uniformly invoked a derivative of this maxim which the Supreme Court adopted for implied private rights of action. *See, e.g., TAMA,* 444 U.S. at 19, 100 S.Ct. at 246–47; *Moreno v. Consolidated Rail Corp.,* 99 F.3d 782, 792 (6th Cir.1996) (en banc); *Crandal v. Ball, Ball & Brosamer, Inc.,* 99 F.3d 907, 910 (9th Cir.1996); *Feins v. American Stock Exchange, Inc.,* 81 F.3d 1215, 1221 (2d Cir.1996); *Zimmerman v. Sloss Equip., Inc.,* 72 F.3d 822, 827 (10th Cir.1995). "[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *TAMA,* 444 U.S. at 19, 100 S.Ct. at 247; *see also Meghrig v. KFC Western, Inc.,* —— U.S. ——, ——, 116 S.Ct. 1251, 1256, 134 L.Ed.2d 121 (1996). Together, the private right of action for states and the administrative appeal process for private persons are evidence against an implied private right of action. *See Jones v. Illinois Dep't of Rehabilitation Servs.,* 504 F.Supp. 1244, 1251 (N.D.Ill.1981) (refusing to provide an implied right of action under the 1978 version of the Rehabilitation Act because of the existence of these judicial and administrative remedies), *aff'd,* 689 F.2d 724 (7th Cir.1982).

Finally, Mallett has not provided any compelling evidence to suggest otherwise. He relies on a committee report disclaimer from 1986. In 1986, Congress amended Title I to remove federal review of some of the state director's decisions by the Secretary of Education. *See* Rehabilitation Act Amendments of 1986, Pub.L. No. 99–506, § 203(b), 100 Stat. 1807, 1815–17 (codified as amended at 29 U.S.C. § 722(b)(2)). After discussing this repeal, the House Conference Report stated that "[n]othing in the conference agreement

---

4. Mallett initiated this action after DVR closed his file and terminated his benefits on March 20, 1989. At that time, § 721(d)(1) was in effect. Congress repealed this provision on October 29, 1992. We will not, however, consider whether this subsequent congressional action evinces an intent to limit judicial remedies under the Rehabilitation Act. We are only concerned with whether Congress implied a private right of action in the Rehabilitation Act as it existed on March 20, 1989.

prohibits any individual from pursuing a private right of action." H.R. Conf. Rep. No. 955, 99th Cong., 2d Sess. 54 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3471, 3517, 3528. While this statement may impact whether other avenues of enforcing private rights of action exist, *see infra,* a congressional disclaimer of any intent to preclude enforcement is not affirmative evidence of an implied private right of action. *See Scattered Corp. v. Chicago Stock Exchange, Inc.,* 98 F.3d 1004, 1005 (7th Cir.1996) (requiring "an indication in the statute's text or structure that private enforcement has been authorized" before a court will allow an implied private right of action). We, therefore, conclude that Congress did not intend to imply a private right of action under § 722. *See Johnson–Lloyd v. Vocational Rehabilitation Office,* 813 F.Supp. 1120, 1123–24 (E.D.Pa.1993) (refusing to imply a right of action under Title I); *McGuire v. Switzer,* 734 F.Supp. 99, 111 & n. 11 (S.D.N.Y.1990) (same); *Ryans,* 542 F.Supp. at 845–46 (same); *Jones,* 504 F.Supp. at 1249–51 (same). The district court properly dismissed Mallett's claim under § 722.

## C. Private Right of Action Under Title I Pursuant to § 1983

 Mallett also argues that he may enforce the provisions of Title I under 42 U.S.C. § 1983.[5] Section 1983 provides that "[e]very person who ... under color of any statute ... subjects ... any citizen of the United States ... to a deprivation of any rights, privileges, or immunities secured by the Constitution and laws ... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court established that § 1983 was available as a remedy for violations of both the Constitution and federal statutes by state and local governmental units. *Id.* at 4, 100 S.Ct. at 2504. However, a violation of a federal statute is not sufficient by itself to support a § 1983

action because § 1983 "speaks in terms of 'rights, privileges, or immunities,' not violations of federal law." *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989). Thus, the Supreme Court has recognized that § 1983 does not provide a remedy in two situations: "where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983." *Wright v. Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987).

### 1. Whether Title I of the Rehabilitation Act Creates Enforceable Rights

Courts and commentators have spilled much ink and caused many trees to be felled discussing whether a statute based on the Spending Clause establishes rights that a beneficiary of the statute may enforce. We, therefore, pause to assess the current state of the law in this area before we evaluate whether Title I creates any enforceable rights.

In *Wilder v. Virginia Hospital Association,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Supreme Court clarified the criteria for making this determination. *Wilder* involved the Boren Amendment to the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A), which required states to submit a plan to be eligible for federal funding. In part, the plan had to provide that the state would pay Medicaid providers "through the use of rates ... which the state finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate...." *Wilder,* 496 U.S. at 503, 110 S.Ct. at 2514 (quoting 42 U.S. § 1396a(a)(13)(A)). Virginia hospitals sued the state under § 1983 to challenge its method of setting reimbursement rates as not "reasonable and adequate." The Court held that § 1396a(a)(13)(A) conferred a right with-

---

5. In his amended complaint, Mallett dismissed his § 1983 claim against DVR. Even though we construe *pro se* complaints liberally, it is impossible to ignore Mallett's statement that he "voluntarily vacate[s] his [§ ] 1983 Civil Rights action against the State ... but maintain[s] his [§ ]

794 Rehabilitation action against the [S]tate and his [§ ] 1983 action against the Director." Appellant's Am. Compl. para.2a. Accordingly, Norman–Nunnery is the sole defendant for this claim.

**1252**

in the meaning of § 1983 for three reasons: 1) the statute was intended to benefit the putative plaintiff, 2) it imposed a "binding obligation" on the governmental unit rather than merely expressing a "congressional preference" for a certain kind of conduct, and 3) the plaintiff's interest was not "too vague and amorphous" as to be beyond the competence of the judiciary to enforce. *Id.* at 509, 110 S.Ct. at 2517.

Two years later, the Supreme Court re-addressed the issue of whether a Spending Clause statute confers a right enforceable through § 1983 in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). This suit involved the Adoption Assistance and Child Welfare Act of 1980 ("Adoption Act"), which established a program for reimbursing states for expenses incurred in administering foster care and adoption services. For a state to receive federal payments, the Secretary of Health and Human Services must have approved the plan, and the plan must provide, among other things, that " 'in each case, reasonable efforts will be made' " to prevent removing a child from his home or to allow a removed child to return home. *Id.* at 351, 112 S.Ct. at 1364 (quoting 42 U.S.C. § 671(a)(15)). A class of plaintiffs sued the Illinois Department of Children and Family Services and two of its administrators for allegedly violating § 671(a)(15) by failing to make these reasonable efforts. *See id.* at 352–53, 112 S.Ct. at 1364–65.

The Supreme Court held that § 671(a)(15) did not create an enforceable right under § 1983. *See id.* at 364, 112 S.Ct. at 1370–71. In making this determination, two facts were repeatedly noted. First, the Court emphasized that § 671(a)(15) required only that a state have a *plan* providing that the state will make "reasonable efforts" to prevent removing a child or to make it possible to return a removed child to his home. *See id.* at 358, 361–62, 112 S.Ct. at 1367–68, 1368–69. Second, it stressed that nothing in the Adoption Act nor its regulations elaborated on what reasonable efforts might entail. *See id.* at 357–62, 112 S.Ct. at 1366–69.

The *Suter* analysis immediately raised questions because it did not explicitly reference the established framework which the Court used two years earlier in *Wilder.* In-

stead, the Court distinguished *Suter* from *Wilder,* explaining that *Wilder* "relied in part on the fact that the statute and regulations set forth in some detail the factors to be considered in determining the methods for calculating rates." *Id.* at 359, 112 S.Ct. at 1368. Thus, the Supreme Court left the obligation of harmonizing these cases to the various Courts of Appeals. *See, e.g., Howe v. Ellenbecker,* 8 F.3d 1258, 1262 n. 5 (8th Cir. 1993) (explaining how "*Suter* weakened earlier precedent in vital respects"), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1373, 128 L.Ed.2d 49 (1994); *Chan v. City of New York,* 1 F.3d 96, 104 (2d Cir.1993) (adopting "the *Wilder* analysis or, to the extent that it differs, the *Suter* analysis"); *Stowell,* 976 F.2d at 68 (recognizing it is "both prudent and possible to synthesize the teachings of *Suter* with the Court's prior precedents").

This Court addressed the problem in *Clifton v. Schafer,* 969 F.2d 278 (7th Cir.1992). Clifton, a benefits recipient of the Aid to Families with Dependent Children ("AFDC") program, sued the Director of the Wisconsin Department of Health and Social Services under § 1983 for a temporary deprivation of his welfare benefits. *See id.* at 284. 45 C.F.R. § 205.10(a)(6)(i), however, requires all state AFDC plans to include provisions that protect a recipient from having his assistance suspended or reduced if that person is facing a reduction or termination of benefits. Like the statutory provision at issue in *Suter,* § 205.10(a)(6)(i) created only an enforceable right to insist that Wisconsin adopt a plan that satisfies the regulation's requirement. *See Clifton,* 969 F.2d at 284. In his case, Clifton did not "dispute that Wisconsin's plan meets the regulation's requirement." *Id.* He, therefore, had no right enforceable under § 1983.

This holding is consistent with the Supreme Court's holding in *Wilder* because Clifton asserted a different challenge than the *Wilder* plaintiffs. "*Wilder* was a suit over the legality of the state plan: the plaintiffs in *Wilder* alleged that the state *plan* itself violated the Boren Amendment because the rates were not reasonable and adequate." *Id.*; *see Wilder,* 496 U.S. at 503–04, 110 S.Ct. at 2514–15. In allowing the plaintiffs to use

§ 1983, the Supreme Court in *Wilder* "held simply that health care providers could sue to enforce their right to a state plan that did not violate the Boren Amendment; it did not hold that providers had a right to challenge any deviation the state might make from a plan that did comply with federal law." *Clifton*, 969 F.2d at 285. Because Clifton alleged an "isolated violation of a concededly legal plan" and because § 205.10(a)(6) affords him only the "right to a plan that complies with the regulation's requirements," Clifton did not have a statutory right to enforce under § 1983. *Id.*; *see also Procopio v. Johnson*, 994 F.2d 325, 332 n. 12 (7th Cir.1993) (refusing to allow use of § 1983 because of *"Clifton's* understanding of this Supreme Court precedent").

■ This limited application of § 1983 also traces the interactive federal-state scheme of Spending Clause statutes. These statutes do not mandate the creation of social service plans. They simply guarantee federal funds if a state elects to provide services that satisfy the federal requirements. Because § 1983 enforces only "rights, privileges, or immunities secured by the Constitution and [federal] laws," a plaintiff may utilize § 1983 only to the extent that a state plan which receives federal funding does not conform to one of the federal requirements. Section 1983, therefore, is not an appropriate means of remedying an isolated violation of an otherwise legal plan. *See Albiston v. Maine Comm'r of Human Servs.*, 7 F.3d 258, 263 (1st Cir.1993) (differentiating "federal-state funding statutes enacted pursuant to the Spending Clause" that place "the onus of compliance with the statute's substantive provisions on the federal government" and those that "impose a *direct obligation on the States*") (emphasis in original).

Thus, *"Suter* left the basic *Wilder* framework intact, but added a further threshold inquiry, applicable in cases involving 'federal-state funding statutes' enacted pursuant to the 'Spending Clause.' " *Albiston*, 7 F.3d at

263 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18, 101 S.Ct. 1531, 1539–40, 67 L.Ed.2d 694 (1981). As Congress enacted Title I of the Rehabilitation Act under the Spending Clause, we first evaluate whether Mallett properly asserts claims under provisions that impose a direct obligation on the States. Then, we apply the three-part *Wilder* analysis to determine whether these provisions create enforceable rights under 42 U.S.C. § 1983.

### a. Whether DVR's plan is "illegal"

Mallett claims that DVR's program violates the federal guidelines and regulations governing the Act. By 1989, DVR had adopted a policy that disfavors graduate school assistance and encourages vocational objectives which require no graduate level training.[6] According to Mallett, this policy violates the Rehabilitation Act's mandate of providing highly individualized services to each beneficiary. In its barest form, Mallett argues that this policy prevents the State from adopting a plan that satisfies a direct obligation which the statute places on the State. It is precisely this type of claim that § 1983 may enforce for federal-state funding statutes enacted pursuant to the Spending Clause like the Rehabilitation Act.

We therefore turn to the three-part *Wilder* analysis to determine whether Mallett may enforce this alleged right. Neither party disputes that Mallett is an intended beneficiary. States that participate in Vocational Rehabilitation Services Program must provide services to all handicapped individuals, and DVR accepted Mallett into its program as a handicapped individual who satisfied the Act's criteria. See 29 U.S.C. § 711(e). Thus, Mallett satisfies the first prong.

The Rehabilitation Act also imposes a binding obligation on participating states to provide individual rehabilitation services. The Act contains thirty-six detailed requirements for all state plans, one of which is "an

---

**6.** The parties dispute the exact language of DVR's program policy provision 5.9.4. Unfortunately, neither party attached to their pleadings or briefs a copy of the provision as it existed in 1989. At oral argument, the court exercised its authority to take judicial notice of this public document. *See* Fed.R.Evid. 201(b). Both par-

ties consented to this action by the court. DVR, however, could not locate a 1989 version of the provision. We rely on the above characterization of the policy because neither party disputes it. *See* Appellant's Br. at 6–7; Appellee's Br. at 8.

individualized written rehabilitation program meeting the requirements of section 722 of this title." *See* 29 U.S.C. § 721(a)(9)(B). Each individualized written rehabilitation program *must* "be designated to achieve the employment objective of the individual, consistent with the unique strengths, resources, priorities, concerns, abilities, and capabilities, of the individual." *Id.* § 722(b)(1)(B)(i). The services provided are "any goods or services necessary to render an individual with handicaps employable, including ... vocational and other training services." *Id.* § 723(a)(3). Together, these provisions impose explicit requirements on federally funded state rehabilitation programs that meet the second prong of the *Wilder* analysis. See *Miller by Miller v. Whitburn*, 10 F.3d 1315, 1318 (7th Cir. 1993) (concluding that obligatory services in the Medicaid program meet *Wilder's* second prong); *Stowell*, 976 F.2d at 69 (deciding that 42 U.S.C. § 1396a(c)(1) is not an enforceable right as it "provides incentives—not commands—to the States").

Finally, Mallett's interest is not so "vague and amorphous" that it is beyond the judiciary's competence to enforce it. *See Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517. Title I requires that individualized written rehabilitation programs must be "consistent with the unique strengths, resources, priorities, concerns, abilities, and capabilities, of the individual." 29 U.S.C. § 722(b)(1)(B)(i). This language is specific, unambiguous, and mandatory. The term's meaning does not vary with the circumstances of each case "so as to be insusceptible to judicial enforcement."

7. When Wisconsin committed itself to establishing a rehabilitation program consistent with the federal guidelines in exchange for federal funding, it agreed to model DVR's procedures on the federal procedures. *See* Wis. Stat. § 47.02.

8. Section 722 provides that:
 (c) The Commissioner shall also insure that (1) ... in developing and carrying out the individualized written rehabilitation program ... emphasis is placed upon the determination and achievement of a vocational goal for such individual, (2) a decision that such an individual is not capable of achieving such a goal and thus is not eligible for vocational rehabilitation services ... is made only in full consultation with such individual ... and only upon the certification, as an amendment to such written program, or as a part of the specification of reasons for an ineligibility determination, as

*Albiston*, 7 F.3d at 264. Rather, it provides "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply" with these provisions. *Pennhurst*, 451 U.S. at 25, 101 S.Ct. at 1544. At its barest level, Mallett's assertion is a question of statutory construction. It is unquestionably within the competence of the judiciary to perform this type of analysis. Thus, the requirement of an individualized written rehabilitation program in § 722(b) creates an enforceable right. *See Marshall v. Switzer*, 10 F.3d 925, 929 (2d Cir.1993) (permitting beneficiary of Title I of Rehabilitation Act to challenge failure to provide mandatory service under sec.sec. 721(a)(8), (a)(9) through § 1983); *McGuire*, 734 F.Supp. at 112 (concluding that sec.sec. 722, 723 create rights enforceable under § 1983); *Ryans*, 542 F.Supp. at 847 (same).

### b. Mallett's other claims

■ Mallett asserts that DVR violated its own procedures [7] in closing his file. Specifically, he alleges that his DVR supervisor failed to certify that Mallett was not capable of graduating from law school in violation of § 722(c) [8] and that he was unable to submit additional evidence in his appeal to an impartial hearing officer in violation of § 722(d)(2).[9] Unlike Mallett's claim against DVR Policy 5.9.4., however, these claims do not assert that DVR has failed to establish a plan that satisfies the Rehabilitation Act requirements. Mallett just alleges that DVR

appropriate, that the preliminary diagnosis or evaluation of rehabilitation potential ... has demonstrated that such individual is not then capable of achieving such a goal, and (3) any such decision, as an amendment to such written program, shall be reviewed at least annually in accordance with the procedure and criteria established in this section.
 29 U.S.C. § 722(c).

9. Section 722(d)(2) states that:
 Such review procedures shall provide an opportunity to such individuals for the submission of additional evidence and information to an impartial hearing officer who shall make a decision based on the provisions of the State plan approved under section 721(a) of this title.
 29 U.S.C. § 722(d)(2).

fails to satisfy these federal requirements in its handling of his case.

This Court in *Clifton* refused to permit a plaintiff to use § 1983 in this manner. *See* 969 F.2d at 285. Spending Clause statutes like the Rehabilitation Act do not afford beneficiaries of the underlying state plan a right to enforce every transgression of federal requirements to receive funding. The Rehabilitation Act's established set of administrative procedures are sufficient to protect against a supervisor or a hearing officer who fails to comply with agency procedures. We see no reason to alter the application of *Clifton's* holding in this instance.

 Mallett also suggests that there is a binding obligation upon DVR, under § 722(b), to give him "an individualized IWRP which allows [financial] assistance at institutions of higher learning." Appellant's Br. at 15. This argument, however, is fundamentally flawed as Congress did not provide this right. Section 722(b) only includes the right to "an individualized written rehabilitation program [that] is *jointly developed,* agreed upon and signed by . . . such eligible individual . . . and . . . the rehabilitation counselor." 29 U.S.C. § 722(b)(1)(A) (emphasis supplied); *see Buchanan v. Ives,* 793 F.Supp. 361, 366 (D.Me.1991) (" '[J]oint' participation does not mean giving a client the final or exclusive decision making authority to determine his own goal."). Furthermore, § 722(b) provides a handicapped individual with an IWRP that is "designed to achieve the employment objective of the individual, consistent with the unique strengths, resources, priorities, concerns, abilities, and capabilities, of the individual." *Id.* § 722(b)(1)(B)(i). There is no provision within § 722(b), however, or within any other section of Title I, that *guarantees* a handi-capped individual the right to financial assistance at an institution of higher learning.[10]

Thus, most of Mallett's claims do not satisfy the first portion of our analysis. However, Mallett may contend that DVR's policy disfavoring graduate school funding violates rights guaranteed in 29 U.S.C. § 722 and enforceable under 42 U.S.C. § 1983 as long as Congress did not foreclose private enforcement of Title I.

### 2. Whether Congress Foreclosed Enforcement of Title I

 The Supreme Court, in *Wilder v. Virginia Hospital Association,* stressed that courts "[should] not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy." 496 U.S. at 520, 110 S.Ct. at 2523 (quoting *Wright,* 479 U.S. at 423–24, 107 S.Ct. at 770–71).[11] To prove that Congress had this intention, defendants have two options. They may show " 'by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." *Id.* at 520–21, 110 S.Ct. at 2523 (quoting *Wright,* 479 U.S. at 423, 107 S.Ct. at 770). Or they may establish that the statute itself creates a remedial scheme that is " 'sufficiently comprehensive . . . to demonstrate congressional intent to preclude the remedy of suits under § 1983.' " *Id.* at 521, 110 S.Ct. at 2523 (quoting *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626–27, 69 L.Ed.2d 435 (1981)); *see also Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468–69, 82 L.Ed.2d 746 (1984) (rejecting use of § 1983 to circumvent Congress' carefully tailored scheme under the Education of the Handicapped Act).

---

**10.** It is true that § 722(b) *may* allow financial assistance at an institution of higher learning. See 29 U.S.C. § 723(a)(3). The Act, however, contains the proviso that "no training services in institutions of higher education shall be paid for with funds under this subchapter unless maximum efforts have been made to secure grant assistance, in whole or in part, from other sources to pay for such training." *Id.*

**11.** While this analysis is similar to determining whether an implied private right of action exists,

the presumption is different. In determining whether Congress intended its remedial procedure to be exclusive, a court must presume that a § 1983 cause of action exists unless there is evidence in the underlying statute which suggests a congressional intention to foreclose this type of action. It is quite possible, therefore, to find the absence of an intention to create an implied right of action and the absence of an intention to exclude a § 1983 right of action in the same statute.

We fail to locate any congressional intention to foreclose a § 1983 remedy for the enforcement of Title I for three reasons. First, the presence of administrative channels for a beneficiary to dispute the content of an IWRP does not preclude judicial review under § 1983. In *Wright*, the Supreme Court analyzed whether the Brooke Amendment to the Housing Act of 1937 and the implementing regulations of the Department of Housing and Urban Development were sufficiently comprehensive that they left no room for additional remedies under § 1983. *See* 479 U.S. at 423–29, 107 S.Ct. at 770–73. The administrative procedures in *Wright* included "informal and formal hearings and administrative appeals, conducted within each [Public Housing Authority (PHA)] by impartial decision makers, to consider adverse decisions taken against tenants by the PHA." *Id.* at 426, 107 S.Ct. at 772. The Court held that review under § 1983 was possible, noting that "the existence of a state administrative remedy does not ordinarily foreclose resort to § 1983." *Id.* at 427–28, 107 S.Ct. at 772–73 (citing *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982)). The Rehabilitation Act contains analogous levels of administrative hearings and appeals to those at issue in *Wright*.

Second, the existence of a judicial remedy does not foreclose the availability of a § 1983 remedy. In *Wright*, the Supreme Court also distinguished the statute at issue from the ones in *Sea Clammers* and *Smith v. Robinson*, noting that those statutes "provided judicial remedies, thereby evidencing congressional intent to supplant the § 1983 remedy." *Id.* at 427, 107 S.Ct. at 772. Even though the Rehabilitation Act provides for a judicial remedy, the statute does not foreclose a private remedy under § 1983 because only a state may use this statutory remedy. This remedy is available only to challenge the approval of a state's plan, any federal limitation on payments, and the proper disbursement of withheld funds. *See* 29 U.S.C. § 721(d)(1). A limited judicial remedy like § 721(d)(1) is not sufficiently comprehensive to preclude a private remedy under § 1983.

Finally, unlike the statutes in *Sea Clammers* and *Smith v. Robinson*, the only discernable congressional intent in the Rehabilitation Act is not to supplant the § 1983 remedy. Mallett argues that legislative history from an amendment evidences an intent to allow a private right of action. In its 1986 Amendment, Congress removed federal review of some of the state director's decisions. *See* Rehabilitation Act Amendments of 1986, 100 Stat. at 1815–17. In the Amendment's House Conference Report, a disclaimer states that "[n]othing in the conference agreement prohibits any individual from pursuing a private right of action." H.R. Conf. Rep. No. 955, 99th Cong., 2d Sess. 54 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3471, 3517, 3528.

We are wary, however, of accepting one line from a conference report as speaking for the entire Congress. Our reluctance stems from the fact that it is unclear whether this statement accurately reflects the view of the conference committee or whether it is the opinion of one House committee staff member. To us, this statement simply suggests that someone wanted to ensure that § 1983 would still be available.

We find the manner in which a private right of action fits into the Rehabilitation's administrative review structure to be persuasive evidence of a congressional intent to allow a private judicial remedy. A private right of action under § 1983 for Title I of the Rehabilitation Act complements the existing administrative procedures without creating overlapping systems of review. A plaintiff may use § 1983 only when he or she alleges that a state's plan does not satisfy a mandatory provision the federal statute requires as a condition for receiving federal funds. *See Clifton*, 969 F.2d at 285. For disputes about whether the application of state plan in a specific instance satisfies the federal requirement, a plaintiff must use the administrative review channels. *See id.* This interaction between judicial and administrative remedies mirrors the federal-state relationship in Spending Clause statutes like the Rehabilitation Act. Contrary to assertions that the Act's remedial scheme is too comprehensive to allow a § 1983 action, we conclude that the structure of the Rehabilitation Act invites a limited application of § 1983.

Thus, Mallett may challenge whether DVR's policy disfavoring funding graduate school education violates his right to an IWRP under § 1983.[12]

### D. Use of § 504 of the Rehabilitation Act to Enforce Title I Violations

 Finally, Mallett claims DVR violated § 504[13] of the Rehabilitation Act by denying him benefits guaranteed under §§ 722, 723. Section 504 is a civil rights provision that prohibits a federal grant recipient from discriminating against otherwise qualified handicapped individuals solely because of that handicap. See Byrne v. Board of Educ., Sch. of West Allis–West Milwaukee, 979 F.2d 560, 563 (7th Cir.1992). Section 504 of the Rehabilitation Act, titled "Nondiscrimination under Federal grants and programs," provides, in relevant part:

> No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

Rehabilitation Act of 1973, ·Pub.L. 93–112, § 504, 87 Stat. 394 (codified as amended at 29 U.S.C. § 794(a)).

 To establish a violation of § 504, a plaintiff must satisfy four requirements: 1) he is a handicapped individual as defined by the Rehabilitation Act, 2) he is otherwise qualified for participation in the program, 3) the program receives federal financial assistance, and 4) he was denied the benefits of the program solely because of his handicap. See Knapp v. Northwestern Univ., 101 F.3d 473, 478 (7th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997).

Mallett was not "otherwise qualified" to receive vocational benefits from DVR. "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." Southeastern Comm. Coll. v. Davis, 442 U.S. 397, 406, 99 S.Ct.

2361, 2367, 60 L.Ed.2d 980 (1979) (emphasis added); see also Grzan v. Charter Hosp. of Northwest Indiana, 104 F.3d ·116, 120 (7th Cir.1997). Mallett would not have been eligible to receive any rehabilitative services in the absence of his handicap. See Flight v. Gloeckler, 878 F.Supp. 424, 426 (N.D.N.Y. 1995) (concluding individual with disabilities is not "otherwise qualified" for Rehabilitation Act), aff'd, 68 F.3d 61 (2d Cir.1995). DVR only treats individuals who qualify. " 'Without a showing that the non-handicapped received the treatment denied to the "otherwise qualified" handicapped, the appellant[ ] cannot assert that a violation of section 504 has occurred.' " Grzan, 104 F.3d at 121 (quoting Johnson by Johnson v. Thompson, 971 F.2d 1487, 1494 (10th Cir.1992)). Mallett has failed to do so in this case.

Mallett has also failed to demonstrate that he was denied treatment "solely by reason of his ... handicap." 29 U.S.C. § 794(a). "The word solely provides the key: the discrimination must result from the handicap and from the handicap alone." Johnson, 971 F.2d at 1493 (establishing that discrimination does not result "solely by reason of [the] handicap" if others with the same handicap do not suffer the discrimination). Mallett alleges that DVR closed his file because of an agency policy disfavoring graduate school and because DVR's failure to follow its procedures prevented him from establishing his merit for this funding in his administrative appeals. Neither of these reasons is related to his handicap. See Flight, 68 F.3d at 64 (concluding § 504 is inapplicable when denial of funding was based on type of vehicle modification requested). Regardless of whether the reasons why Mallett was denied funding for graduate school were legal or illegal, they were not based on his handicap. Mallett has failed to establish two elements of a prima facie case under § 504; he, therefore, cannot state a claim under § 504 for a discharge from DVR program for any of the reasons proffered.

---

12. We do not express any view as to the merits of the dispute, that is, whether § 722 prohibits states from adopting a policy disfavoring funding graduate school education, as the district court has not yet addressed that issue.

13. For unknown reasons, the statutory section number has been relied upon when referring to this claim (§ 504), instead of the Code provision number (§ 794(a)). We will adopt this convention when discussing this claim for the sake of clarity.

For the reasons stated above, we AFFIRM the district court's dismissal of Mallett's claims under 29 U.S.C. §§ 722, 794. However, we REVERSE its dismissal of Mallett's claim under 42 U.S.C. § 1983 that DVR's policy disfavoring graduate school funding violates his right to an individualized written rehabilitation plan and REMAND for further proceedings consistent with this opinion.