Donna Lee H. WILLIAMS, Insurance Commissioner of the State of Delaware, as Receiver of National Heritage Life Insurance Company in Rehabilitation, Continental Stock Transfer & Trust Company, Midwest Independent Bank, and Midwest Mortgage Servicing, L.L.C., Plaintiff,

v.

NATIONAL HOUSING EXCHANGE, INC., APX Mortgage Services, Inc., and Resources Asset Management, Inc., Defendants.

No. 95 C 4243.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 16, 2000.

---

David Brian Montgomery, Wildman, Harrold, Allen & Dixon, Chicago, IL, Steven Samuel Scholes, McDermott, Will & Emery, Chicago, IL, Michael S. Oberman, Ronald S. Greenberg, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, David J. Stetler, Stetler & Duffy, Ltd., Chicago, IL, for Donna Lee H Williams, plaintiff.

Steven Samuel Scholes, Andrew Dash, Berlack, Israels & Liberman, New York City, for Continental Stock Transfer & Trust Company, plaintiff.

Richard M. Waris, Pretzel & Stouffer, Chtd. Chicago, IL, for Midwest Independent Bank, Midwest Mortgage Servicing, L.L.C., plaintiffs.

Robert E. Davy, Robert E. Davy, Jr. & Associates, Chicago, IL, for Resource Asset Management, Inc., defendant.

Marc Oliver Beem, David J. Krupp, Diane Frances Klotnia, Miller, Shakman, Hamilton, Kurtzon & Shlifke, Chicago, IL, for David J Krupp, receiver.

Robert E. Davy, Robert E. Davy, Jr. & Associates, Chicago, IL, for Keith Pound, third-party defendant.

Scott R. Lassar, United States Attorney's Office, Chicago, IL, for United States of America, intervenor.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Keith Pound was the incorporator and president of Resources Asset Management ("RAM"), a mortgage services firm, and a big time crook. This year he was found guilty of sixty-seven counts of fraud and

racketeering in connection with the activities of RAM, among other enterprises he created, and was sentenced by a federal court in Florida to 740 years in prison. The case now before me, however, is a civil action concerning a small part of the facts that underlay Mr. Pound's criminal conviction. Here several victims of some of Mr. Pound's frauds sued RAM and him in connection with what they claim to be the wrongful use or misappropriation of money they had entrusted to RAM's care. They move for summary judgment, and I grant the motion.

## I.

In 1993, National Housing Exchange ("NHE") issued a bond with a face value of $126,000,000, secured by a pool of mortgage debentures. This bond was purchased by National Heritage Life Insurance Company ("National Heritage") in December 1993, which entered into an Indenture and Servicing Agreement (the "Indenture"), with Continental Stock Transfer and Trust Company ("Continental"), the bond's trustee, and APX Mortgage Services ("APX"), the servicer of the mortgages securing the bond. In May 1994, the Delaware Court of Chancery placed National Heritage in rehabilitation and then in November 1995, in liquidation. The Delaware Commissioner of Insurance, Donna Lee H. Williams (the "Commissioner"), was appointed as receiver for National Heritage.

However, things had already begun to go bad on the other side of the deal. In the summer of 1994, Continental and the Commissioner informed NHE and APX that they had failed to comply with their obligations under the Indenture and were in default. In November 1994, Continental notified NHE and APX that their rights under the Indenture were terminated, and Midwest Independent Bank and Midwest Mortgage Servicing ("Midwest"), a Missouri corporation and its subsidiary, took control of APX's assets under a security agreement that Midwest and APX had entered into earlier that year.

Now, enter RAM, the relevant defendant here. It was incorporated by Mr. Pound, with himself as president, in October 1994, and took over APX's business, including the servicing of the mortgages, in December 1994, when APX shut down. NHE authorized the appointment of Midwest as servicer of the mortgages if RAM was appointed subservicer, which it was in an agreement of December 23, 1994, (the "Agreement"). When it was informed of the appointments in January 1995, Continental was not pleased. It rejected the designation of Midwest as servicer, and demanded that RAM turn over all files relating to the mortgages, but RAM refused. Continental and the Commissioner then approved Midwest as a servicer. RAM retained possession of the files and acted as subservicer.

From December 1994 through August 1995, RAM paid itself a 1% servicing fee of at least $982,820.53, out of bank accounts RAM maintained for purposes of collecting and disbursing monies related to the bond (the "bond accounts"), moreover carrying the loans at a higher principal balance than their fair market value, increasing the amount derived from the servicing fee.

RAM also purchased from South Star, a Florida corporation, a first, second, and third mortgage secured by property in Laguna Beach, California, that had been acquired, ultimately, from the Resolution Trust Corporation. RAM used the third mortgage as collateral for the bond and, in March 1995, purchased the first and second mortgages in the name of NHE with $476,957.67 taken from the bond accounts. On March 24, 1995, RAM paid South Star $130.007.95 in "unidentified funds," from an account for monies received from borrowers that it could not otherwise attribute, and it also paid South Star $92,274.06 in funds from another account that had been established to maintain monies generated by mortgage loans prior to December 29, 1993.

From December 1995 through September 1995, RAM paid itself $110,544.15 in borrower late charges from the bond accounts. Between February and May 1995, RAM paid National Workout, an Illinois firm incorporated by Mr. Pound, purportedly devoted to renegotiating delinquent loans, a total of $74,900 from bond accounts which was repaid from further monies Mr. Pound transferred from loan accounts RAM was maintaining for Continental. On March 20 1995, under a workout agreement, RAM allowed a borrower, Mr. Valentine, to pay off his mortgage loan with $650,000, less than he owed, and then paid $36,693 to South Star, purportedly as accrued interest. From January to November 1995, RAM paid $46,542.32 of its own corporate expenses out of the bond accounts; and in February and May 1995, it paid $3,987.60 in travel expenses for its employees out of those accounts.

Between May and August of 1995, RAM modified at least seven non-performing mortgage loans to characterize them as "performing," paying itself at least $22,854.37 as "modification fees." From May to December 1995, RAM paid itself $14,112.72 in interest accumulated in a Tax and Insurance Account to which borrowers' insurance and tax payments were credited. In November 1995, RAM paid itself $10,561.55 from the Real Estate Tax Account, to which borrower's tax payments were credited. After this case was filed on March 7, 1995, and until August of that year, RAM paid $171.493.41 in attorneys' fees out of the bond accounts.

In an order of January 8, 1996, I appointed a receiver to take possession of the mortgage loans, accounts, and files, and all of RAM's bank accounts. RAM purportedly complied, but in December 1995, Mr. Pound had withdrawn $85,000 from RAM's corporate account that he did not disclose to the receiver; Mr. Pound subsequently redeposited the funds and used them to pay $50,000 to a lawyer.

Mr. Pound, APX, RAM, and National Workout were indicted in April 1998 in a 93–count, 165–page indictment by the United States Attorney for the Middle District of Florida, which included counts of fraud facilitation and concealment, fraud and theft with relation to the bond, as well as charges of fraud connected with APX and RAM mortgage services and money laundering with regard to the debenture mortgages collections. Mr. Pound was convicted of all 67 counts with which he was charged and sentenced to serve 740 years in federal prison, three years of supervised release, and perform 75 hours of community service, and ordered to pay $133,854,104.24 in restitution to the Commissioner.

II.

The Commissioner moves for summary judgment on counts XIII (breach of contract), count XIV (unjust enrichment), count XV (breach of fiduciary duty), and count XVI (civil conspiracy) against RAM, and asks for $2,258,601.50, plus pre-judgment interest, attorneys' fees and costs.

Midwest also moves for summary judgment on RAM's first and second counterclaims and Midwest's affirmative defenses. The counterclaims are respectively, that (1) Midwest is in breach of the Agreement of December 23, 1994, to pay a 1% "pull fee" of $1,134,268, plus interest from January 15, 1996, to judgment, and (2) that RAM is entitled to full indemnification, including attorneys' fees, under that Agreement for all losses RAM might incur as a result of the Commissioner's complaint, including reasonable attorneys' fees. In its summary judgment motion, Midwest argues various affirmative defenses, including: that RAM fraudulently induced it to enter into the December 23, 1994, Agreement; that RAM may not profit from its wrong because of its unclean hands; and that Pound's conviction on substantially the facts involved in RAM's counterclaims bars his attempt to relitigate these matters here.

Summary judgment is a means for avoiding a trial when the best evidence the party opposing the motion can bring would not win the claims even if believed. It is appropriate where " 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Bridgman v. New Trier High School Dist. No. 203*, 128 F.3d 1146, 1148 (7th Cir.1997) (*quoting* Fed.R.Civ.P. 56(c)). I construe the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in favor of that party. *Id.* A genuine issue of material fact does not exist unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir.1999). The non-moving party "may not rest only upon the allegations set forth in the pleadings, but must come forward with specific facts sufficient to raise a genuine issue for trial." *Id.* at 794–95 (internal citations omitted).

 Although he is not a party, Mr. Pound responds to the summary judgment on his own behalf and as president of RAM. If he represents himself, I would have to give Mr. Pound a lot of latitude because he is not represented by counsel. *Mallett v. Wisconsin Div. of Vocational Rehabilitation*, 130 F.3d 1245, 1248 (7th Cir.1997) (legal filings drafted by pro se plaintiffs are to be construed liberally). However, Mr. Pound cannot represent RAM because he is not an attorney.[1] "Corporations . . . [can] appear in federal courts only through licensed counsel." *Rowland v. California Men's Colony*, 506 U.S. 194, 195, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) (*citing Osborn v. Bank of the United States*, 9 Wheat. 738, 22 U.S. 738, 828, 6 L.Ed. 204 (1824) (opinion of Marshall, C.J.) (A "corporation can only appear by attorney.")); *see also* 28 U.S.C. § 1654 (governing appearances in federal court). Accordingly, I cannot accept his response

on behalf of RAM, and must treat RAM as having waived any response. That alone is enough to warrant summary judgment with respect to the plaintiffs' claims against RAM.

### III.

 Even if RAM's pleadings could be considered, it would lose. In the first place, RAM failed to file its Local Rule 56.1 (formerly Rule 12) statement of material facts, and "a failure to properly contest in the 12(N) statement material facts set out in the movant's 12(M) statement[ ] constitutes a binding admission of those facts." *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir.1997). In such a case, I "depart from [the] usual posture of construing all facts in favor of the nonmoving party; rather [I] accept as true all material facts contained in [the moving party's] 12(M) statement." *Id.* Accordingly, I accept the facts as set forth by the Commissioner and Midwest. Obviously accepting the plaintiffs' version of the facts prejudices the defendants' case.

Second, apart from the formalities of filing, RAM's arguments against the Commissioner fail to meet the burden imposed on a party opposing a summary judgment motion. RAM does not have an onerous burden: the party opposing the motion "need not tender evidence in a form that would be admissible at trial; he may rely on affidavits or any other materials of the kind identified in Rule 56(c); . . . [h]e need not match the movant witness for witness, nor persuade the court that his case is convincing; he need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Liu*, 191 F.3d at 796–97. But "he must do that much." *Id.* at 797. Here, RAM did not.

 The Commissioner argues, first, that RAM breached the December 23,

---

1. At least, he does not indicate that he is an attorney licensed to practice in this jurisdiction. RAM was initially represented by coun-

sel, who, however, withdrew on February 25, 2000.

1994, Agreement between Midwest and RAM, causing harm to National Heritage, the intended third party beneficiary of the Agreement. In Illinois, whose law governs here, a third party can have rights under a contract if contracting parties "have manifested an intent to confer a benefit on [it]." *Ocasek v. City of Chicago*, 275 Ill.App.3d 628, 211 Ill.Dec. 852, 656 N.E.2d 44, 49 (1995). Illinois courts "look to the contract to determine the intent of the parties. 'The test is whether the benefit to the third person is direct to [it] or is but an incidental benefit to [it] arising from the contract.'" *Id.* (internal citation omitted). A third-party beneficiary may sue for breach of a contract made for [its] benefit. *Santucci Constr. Co. v. Baxter & Woodman, Inc.*, 151 Ill.App.3d 547, 104 Ill.Dec. 474, 502 N.E.2d 1134, 1141 (1986). The Commissioner, acting for National Heritage, may sue on the contract if National Heritage was a third party beneficiary. RAM does not dispute that it was, and the Agreement specified on its face that its beneficiary was the "debentureholder," here, National Heritage. So the Commissioner may sue on the contract. It is therefore irrelevant that RAM had no contractual obligation to National Heritage.

█ The Commissioner argues that RAM breached the § 6(a) of the December 23, 1994 Agreement and §§ 6.05 and 6.16 of the Indenture. Section 6(a) of the December 23, 1994, Agreement required RAM to "carry out all of its obligations hereunder at its own expense, except as otherwise specifically provided." Section 6.16 of the Indenture is to the same effect, and § 6.05 allows RAM to use proceeds of the mortgage loans only for certain limited purposes, such as paying real estate taxes and insurance premiums on the mortgaged properties. The expenses listed above were in violation of both agreements. RAM claims that § 6.05 allows for attorneys' fees for foreclosure work to be paid from the bond's proceeds, but it does not.

RAM also asserts that several thousand dollars paid from those accounts to C.T. Corp. were expended for permitted collections activities, but a mere assertion will not suffice to show this. It argues that the Commissioner approved travel expenses and other operating expenses, but presents no evidence of this fact. Its other arguments concerning "customary practices in the industry" or knowledge by the Commissioner of the money paid to National Workout do not go to whether the contract was breached. It has not produced evidence on which a rational jury could decide in its favor on this count if that evidence was believed. I grant summary judgment to the Commissioner on her claim of breach of contract.

RAM fails to respond to the claims for unjust enrichment, breach of fiduciary duty, or civil conspiracy, and so has waived any arguments on the count, effectively conceding them. I grant summary judgment on these counts also.

## IV.

For its part, Midwest asks for summary judgment on RAM's first and second counterclaims and its own affirmative defenses. Midwest argues that RAM fraudulently induced Midwest into entering the December 23, 1994 Agreement, and so is not liable on that Agreement for the 1% "pull fee" or indemnification, and anyway should not be allowed to profit from its dirty hands or relitigate matters decided in the criminal case.

Midwest's pleadings are sloppy, and if RAM were represented by a competent attorney, Midwest would lose this motion. The fraudulent inducement defense on which it puts all its bets in the summary judgment motion was not pled with the degree of specificity required by Fed. R.Civ.P. 9(b): "[T]he circumstances constituting fraud ... shall be stated with particularity."[2] A sufficient level of factual

---

**2.** An affirmative defense of fraud is subject to Rule 9(b). *Systemation, Inc. v. Engel Indus., Inc.,* 183 F.R.D. 49 (D.Mass.1998) (and cases

support may be found "where the circumstances are pled 'in detail.'" *In re Health-Care Compare Corp. Securities Litigation,* 75 F.3d 276, 281 (7th Cir.1996). "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). On this motion, despite several lengthy statements of facts, Midwest fails to provide a coherent account of the alleged fraudulent inducement.

Midwest argues that RAM is barred from relitigating the matters decided in the criminal case where Mr. Pound was found guilty of "similar if not identical facts at issue in this case," and specifically the facts, whatever they might be, underlying the fraudulent inducement claim. But Midwest fails to match up the counts in the indictment of which Mr. Pound was found guilty with any particular descriptions of matters supposedly being relitigated here, leaving me with the argument, in effect, that I should hold that RAM is barred from litigating its counterclaims against Midwest because Mr. Pound is a convicted fraudster and, generally speaking, a bad guy. Needless to say, this won't do.

Midwest's "unclean hands" argument is vitiated by similar flaws. Mr. Pound may be a crook, but even convicted fraudsters and generally bad guys have the right to enforce a contract. Midwest is lucky that RAM's counsel withdrew after answering, leaving RAM without the ability to defend itself on this motion, which I must therefore grant as unopposed.

## V.

I therefore GRANT as unopposed the Commissioner's motion for summary judgment against RAM on counts XIII–XVI and award it $2,258,601.50, plus pre-judgment interest, reasonable attorneys' fees and costs. I also GRANT as unopposed summary judgment for Midwest on RAM's

first and second counterclaims and Midwest's affirmative defenses.