187 F.3d 743 (7th Cir. 1999)
 INDIANAPOLIS MINORITY CONTRACTORS ASSOCIATION, INCORPORATED, an Indiana not for profit corporation, LENZO HARRIS, FRAN SCOTT, et al., Plaintiffs-Appellants,
v.
CURTIS WILEY, in his capacity as Commissioner of the Indiana State Department of Transportation, INDIANA DEPARTMENT OF TRANSPORTATION, BETTY
COCKRUM, in her capacity as Commissioner of the Indiana Department of Administration, et al., Defendants-Appellees.
 No. 98-2267
 United States Court of Appeals, Seventh Circuit
 Argued November 13, 1998
Decided August 13, 1999
Rehearing En Banc Denied October 13, 1999
 
 Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. No. 94 C 1175--John D. Tinder, Judge.[Copyrighted Material Omitted]
 Before BAUER, RIPPLE and EVANS, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 The plaintiffs brought this action under 42 U.S.C. sec. 1983, 42 U.S.C. sec. 1985, and Title VI of the Civil Rights Act of 1964 (42 U.S.C. sec. 2000d) to challenge the manner in which Indiana administers the program for minority-owned business participation required by federal statutes and regulations providing federal funding for highway construction. The plaintiffs appeal the district court's decision to grant summary judgment in favor of the defendants as well as various evidentiary rulings made by the district court prior to its summary judgment ruling. For the reasons set forth in the following opinion, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. The Statutory Scheme
 
 3
 In various highway funding statutes, Congress has established participation goals for minority- owned contractors. Under the Surface Transportation Assistance Act of 1982 ("STAA"),[1] the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA"),[2] and the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"),[3] each recipient of federal highway funds must expend at least 10% of such funds with small business concerns owned and controlled by socially and economically disadvantaged individuals.
 
 
 4
 The Department of Transportation ("DOT") has promulgated regulations to implement these statutes. See 49 C.F.R. Pt. 23 (1998). These regulations require states receiving federal funds to submit to the DOT a disadvantaged business enterprise affirmative action program. See id. sec. 23.43(b). The regulations also establish eligibility standards that a business must meet to be certified as a disadvantaged business enterprise ("DBE"). See id. sec. 23.62. The governing statutes provide that Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and women are rebuttably presumed to be "socially and economically disadvantaged." When certifying companies as DBEs, a state may apply this presumption without investigating the situation of particular applicants. See id. sec. 23.69 & App. A to Subpt. D. However, the regulations allow third parties to challenge the certification of a particular business by presenting evidence to rebut the presumption of disadvantage. See id.
 
 
 5
 The statutory scheme does not provide specific goals or quotas for participation by any particular disadvantaged group but instead establishes an overall goal of DBE participation of 10% for all groups combined. See id. sec.sec. 23.61, 23.62. The Secretary of Transportation is authorized to approve an overall goal of less than 10% if a state provides sufficient justification for a lower percentage. See id. sec. 23.65. The DBE requirements apply to all contracts funded in whole or in part by federal highway money. See id. sec. 23.43.
 
 B. Proceedings in the District Court
 
 6
 The plaintiffs[4] brought suit in district court, alleging that Indiana[5] has not fulfilled its responsibilities under the statutory scheme. Their primary claim is that Indiana has improperly satisfied the 10% DBE participation requirement by certifying and giving business to various "sham" or "front" companies that are not truly disadvantaged, thus diverting business from legitimate DBEs. The plaintiffs also assert that certain aspects of Indiana's DBE program do not comply with federal requirements. In particular, the plaintiffs complain of the manner in which Indiana conducts the certification process, its failure to provide a bonding, finance, and technical assistance program, and its failure to meet the 10% DBE requirements legitimately. The plaintiffs seek relief under sec. 1983 for alleged violations of the federal statutes and the Fourteenth Amendment's Equal Protection Clause, under Title VI (42 U.S.C. sec. 2000d) for the defendants' allegedly discriminatory administration of a federally funded program, and under 42 U.S.C. sec. 1985(3) for conspiracy to violate the plaintiffs' civil rights.
 
 
 7
 In prior stages of this litigation, the district court dismissed on Eleventh Amendment grounds all claims against the State of Indiana, INDOT, and DOA, except for the Title VI claim. The district court also dismissed all sec. 1983 claims for money damages against the individual state officers sued in their official capacities. The claims that remained at the summary judgment stage are 1) the sec. 1983 claim for prospective relief against the individual state officials for alleged violations of STURAA and ISTEA, 2) the sec. 1983 claim for prospective relief against the individual state officials for alleged violations of equal protection, 3) the Title VI claim against the State of Indiana, INDOT, DOA, and the individual defendants, and 4) the sec. 1985 claim against the individual defendants.
 
 C. Holding of the District Court
 
 8
 In a comprehensive and thoughtful opinion, the district court addressed the parties' cross motions for summary judgment.[6]
 
 A.
 
 9
 The district court first addressed the plaintiffs' sec. 1983 claim for alleged violations of STURAA, ISTEA, and the implementing regulations. Relying on the Supreme Court's decision in Blessing v. Freestone, 117 S. Ct. 1353 (1997), the court concluded that the statutory scheme does not give rise to individual rights enforceable under sec. 1983. The court explained that, because the statutory scheme only prescribes a course of conduct for states to follow in structuring their DBE programs but does not confer any particular benefits on any particular individuals, the plaintiffs have no individual rights enforceable under sec. 1983. The court nevertheless did conclude that, under the reasoning in Mallett v. Wisconsin Division of Vocational Rehabilitation, 130 F.3d 1245, 1252-53 (7th Cir. 1997), the plaintiffs could utilize sec. 1983 to sue for a DBE plan that complies withfederal requirements for the receipt of highway funding. The court emphasized that the plaintiffs do not, however, have an individual right to sue under sec. 1983 to remedy isolated violations of an otherwise compliant plan.
 
 B.
 
 10
 Turning next to the plaintiffs' sec. 1983 claim for a statewide plan that complies with federal requirements, the district court determined that Indiana's program meets all federal requirements. The district court conducted a detailed review of Indiana's DBE plan in light of the program components required under 49 C.F.R. sec. 23.45 and concluded that the plan satisfies the regulatory requirements. The court noted that Indiana's plan was first approved by the Federal Highway Administration in 1983 and has been re- approved periodically since then.
 
 
 11
 The district court then addressed specifically the plaintiffs' three arguments that Indiana's program violates federal requirements: 1) the lack of a bonding and financial assistance program, 2) the alleged failure to conduct site visits during the certification process, and 3) the alleged failure to meet the 10% DBE goal. First, the district court concluded that there was no issue for trial on the plaintiffs' first contention, because the federal regulations do not require a bonding program. The court explained that 49 C.F.R. sec. 23.41 requires states to implement a DBE plan that incorporates the elements listed in sec. 23.45(e) through (i), which do not include a bonding and financial assistance program. Next, the court held that the plaintiffs had not adequately shown that the defendants failed to conduct site visits, because the plaintiffs' key witness testified only that she was unaware of any site visit to her company. Moreover, the court held, the use of post office box numbers rather than street addresses for many firms listed in the DBE directories was not probative of the state's alleged noncompliance with the site visit requirement. Finally, the district court found no genuine issue as to the plaintiffs' third contention--that Indiana never met the 10% DBE goal--because it was not supported by any facts. The plaintiffs' key argument is that Indiana uses front companies to fulfill the DBE requirements. However, the plaintiffs never challenged the DBE certifications of any of these companies, as provided for in 49 C.F.R. sec. 23.69; nor have the plaintiffs made any showing that Indiana had any information in its possession that would rebut the presumption of these companies' DBE eligibility. The district court therefore granted summary judgment for the defendants on this sec. 1983 claim.
 
 C.
 
 12
 The district court then turned to the plaintiffs' sec. 1983 claim for alleged violations of the Fourteenth Amendment's Equal Protection Clause. The court first addressed the various plaintiffs' Article III standing to bring this claim. The court determined that the Contractors Association has standing as a representative of its members, but only to seek equitable remedies. The court then held that only the two plaintiffs who own certified DBEs, Fran Scott and Al Young, could possibly establish the first standing requirement of an injury in fact, because only they could show that they were ready, willing, and able to bid on federally funded highway contracts but that a race-based barrier impaired their ability to compete on an equal basis with other DBE contractors. However, the court held, even if these two plaintiffs could show an injury in fact, they could not demonstrate the second standing requirement of a causal connection between the defendants' conduct and their injury. In the court's view, the plaintiffs simply had produced no evidence of any race-based or discriminatory policy of the state, or any other barrier imposed by the state, that impeded the plaintiffs' ability to bid on contracts relative to other certified DBEs.
 
 
 13
 In the alternative, the court held, even if the plaintiffs had standing, their equal protection claim must fail on the merits because they have not shown that the defendants acted with discriminatory intent. The court relied on our decision in Nabozny v. Podlesny, 92 F.3d 446, 453-54 (7th Cir. 1996), which made clear that liability under sec. 1983 for a violation of equal protection requires a showing that the defendants acted with discriminatory purpose and discriminated against the plaintiffs based on their membership in a defined class.
 
 D.
 
 14
 Turning next to the plaintiffs' Title VI claim, the district court held that, because the plaintiffs had not shown a violation of the Equal Protection Clause, they could not prove a direct claim under Title VI. As for a possible disparate impact claim, the district court found that the plaintiffs had failed to support such a claim with any evidence of a statistical disparity between the percentage of contracts awarded to African American DBEs and the percentage of DBEs qualified for highway construction work that are owned by African Americans.
 
 E.
 
 15
 Finally, the district court concluded that the plaintiffs' sec. 1985 claim was without merit because they had presented no admissible evidence demonstrating an express or implied agreement; nor had they established any underlying violation of federal law.
 
 II
 DISCUSSION
 A. sec. 1983 Claim Under STURAA and ISTEA
 
 16
 We first address the plaintiffs' submission that the district court erred in holding that the statutory scheme does not create individual rights enforceable through sec. 1983. In Blessing v. Freestone, 117 S. Ct. 1353 (1997), the Supreme Court first emphasized the governing principle: "In order to seek redress through sec. 1983 . . . a plaintiff must assert the violation of a federal right, not merely a violation of federal law." Id. at 1359. The Court then clarified the test to determine whether a statute gives rise to a federal right that is enforceable under sec. 1983:
 
 
 17
 We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. [Wright v. City of Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 430 (1987)]. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. [Id. at 431-32]. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms. [Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 510-11 (1990)].
 
 
 18
 Id. at 1359 (parallel citations omitted). If the existence of a federal right is established by satisfying these three requirements, the Court explained, there is a presumption that the right is enforceable under sec. 1983; but that presumption may be rebutted if Congress intended to foreclose a remedy under sec. 1983. See id. at 1360.
 
 
 19
 In Blessing, the Court further provided specific guidance on the first prong of this inquiry-- determining whether Congress intended, in a particular statutory provision, to benefit the individual seeking enforcement of the alleged federal right. The Court distinguished between provisions that are intended to benefit particular individuals and thereby create "an individual entitlement to services" and those that are "designed only to guide the State in structuring its systemwide efforts." Id. at 1361. Although provisions of the latter type may ultimately benefit individuals, the Court explained, they do so only indirectly and do not give rise to enforceable individual rights. See id. Instead, such provisions simply create "a yardstick" for the state to measure the systemwide performance of the program the state is operating pursuant to the statute. Id. The Court also emphasized that, rather than taking a blanket approach to determining whether a statutory scheme creates rights, courts must require plaintiffs to identify with particularity the specific rights that they believe arise from specific statutory provisions. See id. at 1360- 61.
 
 
 20
 With these principles in mind, we must analyze the statutory scheme in the case before us to determine whether it gives rise to any enforceable individual rights. The plaintiffs rely on our decision in Marie O. v. Edgar, 131 F.3d 610 (7th Cir. 1997), to support their contention that the highway funding statutory scheme gives rise to individual rights enforceable through sec. 1983. In Marie O., we concluded that the plaintiffs, infants with disabilities, were the intended beneficiaries of Part H of the Individuals with Disabilities Education Act ("IDEA"), because its provisions confer upon specifically identified individuals certain entitlements to specific services. See id. at 619-20.[7]
 
 
 21
 After reviewing STURAA, ISTEA, and the implementing regulations, we conclude that the statutory scheme in this case is like the one described in Blessing, rather than the one we had before us in Marie O. The statutes themselves provide only very generally that recipients of federal highway funds must expend at least 10% of such funds with small business concerns owned and controlled by socially and economically disadvantaged individuals. See STURAA, Pub. L. No. 100-17, sec. 106(c)(1), 101 Stat. 132; ISTEA, Pub. L. No. 102-240, sec. 1003(b)(1), 105 Stat. 1914, 1919. The implementing regulations set out in great detail the obligations that recipients of federal highway dollars must fulfill with respect to minority participation. The regulations require recipients to submit for approval by the DOT a minority business enterprise affirmative action program; the regulations also specify various required program components. See 47 C.F.R. sec.sec. 23.43, 23.45. The regulations further specify, for example, the manner in which states must calculate minority participation, requirements for record keeping, the eligibility standards that states must apply to applicants for DBE status, and the procedures that states must use when certifying disadvantaged businesses or when entertaining a challenge to a certification. See id. sec.sec. 23.47, 23.49, 23.51, 23.53. In short, the regulatory requirements focus on what the states must do, in structuring their programs, to maximize the opportunity of minority businesses to participate in contracts financed with federal funds; the regulations do not confer specific entitlements upon any individuals. Indeed, the 10% minority participation goal is for all DBEs combined; it does not guarantee that any one disadvantaged group will receive any contracts, let alone that any individual in any group will receive a contract or any other individual benefit. Therefore, because the statutes and regulations do not guarantee any specific benefit or service to any identifiable individual, we hold that the plaintiffs are unable to satisfy the first prong of the enforceable rights inquiry set out in Blessing.[8] We therefore affirm the district court's grant of summary judgment for the defendants on this claim.
 
 
 22
 B. sec. 1983 Claim Under the Fourteenth Amendment
 
 
 23
 The plaintiffs challenge the district court's holding that their Fourteenth Amendment claim must fail on the merits because they have not demonstrated discriminatory intent on the part of the defendants.[9] In order to establish liability under sec. 1983 for a violation of equal protection, the plaintiffs "must show that the defendants acted with a nefarious discriminatory purpose, and discriminated against [them] based on [their] membership in a definable class." Nabozny v. Podlesny, 92 F.3d 446, 453 (7th Cir. 1996) (citation omitted). We have explained:
 
 
 24
 The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.
 
 
 25
 Id. at 453-54 (quoting Shango v. Jurich, 681 F.2d 1091, 1104 (7th Cir. 1982) (citations and internal quotation marks omitted)). "A showing that the defendants were negligent will not suffice. [The plaintiffs] must show that the defendants acted either intentionally or with deliberate indifference." Id.
 
 
 26
 The plaintiffs point to only one piece of evidence admitted by the district court to show the defendants' intent to discriminate against the plaintiffs on the basis of race: former Commissioner of INDOT Christine Letts' comment to Harry Alford that she planned to satisfy the DBE requirements by giving business to the Harmon companies. Letts' alleged intention to award contracts to the Harmon companies, which the plaintiffs repeatedly remind us are owned by a wealthy black businessman, hardly evinces any race-based discriminatory intent necessary to establish a violation of the Fourteenth Amendment under this count.
 
 
 27
 The plaintiffs also contend that the requisite discriminatory intent can be established by reliance on various items of evidence excluded by the district court: 1) Exhibits 22 and 23, which the plaintiffs maintain demonstrate that the Harmon companies and another company called C- Tech received a large share of the contracts awarded to DBEs; 2) the Indianapolis Disparity Study; and 3) the Gibson Reports. Even if these items were admissible,[10] we cannot say that they show any race-based discriminatory intent on the part of the defendants.
 
 
 28
 The data contained in Exhibits 22 and 23 in no way demonstrates that the two companies were improperly certified or that the defendants were motivated by race-based discriminatory intent in certifying them or awarding contracts to them.
 
 
 29
 The Indianapolis Disparity Study also provides no evidence of discriminatory intent by the defendants in their administration of the statewide DBE program operated pursuant to the federal highway funding statutes. Instead, as its title suggests, the Indianapolis Disparity Study analyzes how the City of Indianapolis distributes its own construction money. The Study documents statistical disparities in the share of city- funded construction work that has gone to businesses owned by individuals of various minority groups compared to the percentages of businesses owned by members of those groups that are available to do the work. The Study also relates anecdotal evidence of discriminatory treatment of minority-owned businesses in the bidding process and by financial institutions. These findings, however, say nothing of the actions or motivations of the defendants named in this case in their administration of Indiana's statewide DBE program for minority participation in federally funded highway construction projects.
 
 
 30
 Finally, we agree with the district court's conclusion that the Gibson Reports are not probative of discriminatory intent in Indiana's administration of its DBE program for federally funded highway construction. The Gibson Reports document weaknesses in Indiana's program for minority participation in state-funded construction. They do not, however, provide any evidence of intentional race-based discrimination by the defendants in their disbursement of federal funds for highway construction.
 
 
 31
 We therefore must affirm the district court's grant of summary judgment for the defendants on this claim on the ground that the plaintiffs have failed to present evidence sufficient to support a finding of discriminatory intent.[11]
 
 C. sec. 1985 Conspiracy Claim
 
 32
 To establish a claim under 42 U.S.C. sec. 1985(3), a plaintiff must demonstrate four elements:
 
 
 33
 (1) a conspiracy;
 
 
 34
 (2) a purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;
 
 
 35
 (3) an act in furtherance of the conspiracy; and
 
 
 36
 (4) an injury to his person or property or a deprivation of any right or privilege of a citizen of the United States.
 
 
 37
 Trautvetter v. Quick, 916 F.2d 1140, 1153 (7th Cir. 1990) (quoting Triad Assocs., Inc. v. Chicago Hous. Auth., 892 F.2d 583, 591 (7th Cir. 1989)) (internal quotation marks omitted).
 
 
 38
 We agree with the district court's conclusion that the plaintiffs have not presented a sufficient factual basis to permit a trier of fact to conclude that an express or implied agreement existed among the defendants (or between the defendants and other private contractors) to deprive the defendants of equal protection. As a threshold matter, we note that the absence of any underlying violation of the plaintiffs' rights precludes the possibility of their succeeding on this conspiracy count. See Scherer v. Balkema, 840 F.2d 437, 442 (7th Cir.), cert. denied, 486 U.S. 1043 (1988).
 
 
 39
 Moreover, we cannot accept the plaintiffs' submission that they have presented sufficient circumstantial evidence to support an inference of a conspiracy to certify front DBE companies. The plaintiffs point to two portions of Harry Alford's deposition. In the first part, Alford testified that Christine Letts told him that she planned to meet the required DBE goals by utilizing the Harmon companies. In the second portion, Alford testified that Letts pushed through the certification of the Harmon companies even though, in Alford's opinion, they were ineligible for certification. Alford testified that the Harmon companies should not have been certified because their controlling owner is William Mays, a black businessman who, in Alford's opinion, is too wealthy to qualify as a disadvantaged business owner. The plaintiffs further submit that other wealthy minority- or female-owned companies have wrongfully been certified and that the very fact that these front companies were certified supports an inference that a conspiracy existed between the defendants and the front companies.
 
 
 40
 Our review of this proffered evidence confirms the district court's conclusion that the plaintiffs have not produced enough evidence for a reasonable trier of fact to infer the existence of a conspiracy. We cannot discern in Harry Alford's testimony anything that indicates an agreement between any of the defendants or between any defendant and any contracting company. Nothing in Alford's testimony indicates that Letts agreed with anyone else to certify the Harmon companies, let alone who that someone else might be. We note, moreover, that nothing in Alford's testimony indicates that Letts thought the Harmon companies were ineligible for certification or that her alleged desire to certify them was motivated by the purpose of discriminating against the plaintiffs on the basis of race.
 
 
 41
 We also cannot accept the plaintiffs' submission that the fact that certain alleged front companies were certified is sufficient to support an inference of a conspiracy. The implementing regulations do not require states to investigate the economic situation of companies who apply for certification; instead, states may apply a presumption of disadvantage to any company that is owned and operated by a member of one of the five categories of minorities. See 49 C.F.R. sec. 23.69 & App. A to Subpt. D.[12] The burden is on third parties to challenge certifications of companies that they believe are unworthy of certification. See id. Only when such a challenge is brought does a state have to investigate the economic situation of the company seeking certification to determine whether the presumption of disadvantage is rebutted. Notably, there is no evidence in the record that anyone challenged the alleged front companies, even though the regulations provide for such challenges. Therefore, even if Indiana has certified certain minority-owned businesses that in truth are too wealthy to qualify for certification, we cannot accept the argument that the fact of their certification alone evidences a conspiracy among the defendants to deprive the plaintiffs of their civil rights.
 
 
 42
 Moreover, even if the plaintiffs had established adequately a conspiracy to certify front DBE companies, they cannot establish that such a conspiracy, as described by the plaintiffs, constitutes a conspiracy to deprive the plaintiffs of equal protection on the basis of race. The plaintiffs' primary complaint about the certification of the front companies is that those companies are too wealthy to justify certification. Among the allegedly wrongfully certified companies are the Harmon companies, which the plaintiffs themselves contend are owned by a black businessman, William Mays. Any conspiracy to certify rich DBEs therefore cannot be characterized as a conspiracy to deny the plaintiffs equal protection through race-based discrimination. As the plaintiffs themselves submit, one of the major beneficiaries of the defendants' alleged wrongdoing is himself black.
 
 
 43
 In sum, we affirm the district court's grant of summary judgment on the sec. 1985 claim. The plaintiffs have not adequately established a conspiracy; nor have they shown that the defendants' purpose was to deprive the plaintiffs of equal protection.
 
 Conclusion
 
 44
 In the opening paragraph of its order granting summary judgment, the district court opined that this case demonstrates the difference between rhetoric and proof in a court of law. Our own examination of the record and consideration of the parties' submissions convince us that the district court's characterization is an accurate one. Accordingly, the judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 Notes:
 
 
 [1]
 Pub. L. No. 97-424, 96 Stat. 2097 (1983).
 
 
 [2]
 Pub. L. No. 100-17, 101 Stat. 132 (1987).
 
 
 [3]
 Pub. L. No. 102-240, 105 Stat. 1914 (1991).
 
 
 [4]
 The plaintiffs in this action are the Indianapolis Minority Contractors Association ("Contractors Association") and numerous African American individuals who are or were owners and operators of contracting businesses in Indiana. On September 12, 1994, approximately one month after this action was originally filed, the Indiana Secretary of State dissolved the Contractors Association for failure to file annual reports. At the time of the district court's summary judgment ruling, Al Young and Fran Scott were the only two individual plaintiffs who owned and controlled companies certified as DBEs. The rest of the individual plaintiffs were not certified at that time, either because their certification had lapsed and was not renewed, or because they never completed the application process for certification.
 
 
 [5]
 The named defendants are two individual state officials sued in their official capacity, the Indiana Department of Transportation ("INDOT"), the Indiana Department of Administration ("DOA"), and the State of Indiana.
 
 
 [6]
 The district court also granted the defendants' motion to strike various items of evidence submitted by the plaintiffs for consideration on summary judgment. In our discussion of the plaintiffs' contentions on appeal, we assume, for the sake of argument, that the excluded material was admissible. Nevertheless, we set forth, for the sake of completeness, the district court's evidentiary rulings. First, the district court found that Plaintiffs' Exhibits 22 and 23--which appear to be computer data extractions listing contractors and dollar amounts--lacked adequate authentication because they contain no legend or other means of identifying what the figures represent and because no showing had been made that the process or system used to create the computer records produced an accurate result. The court also concluded that Exhibit 35, the City of Indianapolis Disparity Study, was not adequately authenticated. Although a disparity study was authenticated by a witness' deposition testimony and was marked as Exhibit 5, no Exhibit 5 was attached to the deposition. The district court was therefore unable to conclude that the study authenticated at the deposition was the same study as Exhibit 35. Moreover, the court noted, Exhibit 35 was not bound and had pages missing and out of order, which raised further concerns about the document's completeness and reliability.
 The district court next granted the defendants' motion to strike the Gibson Reports (Exhibits 16 and 18), which were prepared for the Office of Minority Business Development in the Indiana DOA. The court determined that the reports were protected by the deliberative process privilege for communications made during governmental decisionmaking processes. The court further found that, because the reports concerned only Indiana's program for minority participation in state-funded construction and not federally funded projects, the reports had little relevance to this case and thus the plaintiffs' need for the documents did not overcome the privilege.
 Next, the district court addressed the defendants' motion to strike the deposition of Harry Alford, the plaintiffs' "expert witness" in the field of affirmative action. The court concluded that the plaintiffs had not established the existence of a sufficiently reliable body of specialized knowledge in the study of affirmative action and that, in any event, the plaintiffs had not shown that Alford is qualified to testify concerning any such body of knowledge. Moreover, the court found, his testimony was unreliable because he provided no basis for his conclusory opinions regarding which companies are "legitimate black companies" and which are front companies. The court also noted that Alford's testimony would not be helpful to the trier of fact and that he had improperly testified as to legal conclusions concerning the state's compliance with federal DBE requirements. The court therefore determined that Harry Alford's deposition would not be considered as expert testimony for purposes of summary judgment. Moreover, the district court struck as hearsay the portion of Alford's deposition in which he testified that two INDOT employees told him that someone had told them that someone in the Governor's office called the Commissioner of INDOT and told the Commissioner to certify certain ineligible companies as DBEs.
 Finally, the district court struck Exhibits 2 through 15, which were the minutes of meetings of the Governor's Commission on Minority Business Development. The court determined that this evidence was irrelevant to the case because it concerned only Indiana's program for minority participation in state-funded contracts. The court concluded that the documents would not be probative of any misuse of federal funds and would be misleading and confusing to the jury.
 
 
 [7]
 Having concluded that the plaintiffs in Marie O. were the intended beneficiaries of the statute, we went on to hold that the second and third prongs of the inquiry were also satisfied and that Congress had not foreclosed a remedy under sec. 1983. We therefore concluded that Part H of IDEA creates individual rights enforceable under sec. 1983. See Marie O., 131 F.3d at 620-23.
 
 
 [8]
 Because we hold that the plaintiffs cannot establish that they are the intended beneficiaries of the statutory and regulatory provisions, we need not reach the second and third prongs of the inquiry, or the issue whether Congress intended to foreclose a remedy under sec. 1983. We note that the plaintiffs emphasize that the statutory scheme's requirements are cast in mandatory terms. However, this argument goes to only the third prong of the analysis--whether the statute imposes binding obligations on the state.
 We also shall not review the district court's grant of summary judgment to the defendants on the claim that Indiana's DBE plan does not comply with federal requirements. The district court proceeded on the understanding that, under the holding of Mallett v. Wisconsin Division of Vocational Rehabilitation, 130 F.3d 1245 (7th Cir. 1997), the plaintiffs had the right to challenge whether Indiana had set up a program that conformed to the federal statutory scheme. They were not entitled, however, to maintain an action seeking redress for any individual deviations from that plan in violation of federal law. Before us, Indiana suggests that, in making this distinction, the district court might well have been "over-generous." See Appellees' Br. at 18. There are, indeed, significant distinctions between Mallett and this case. Most important, in Mallett, the court determined that the three-part Wright-Wilder analysis explicated in Blessing had been satisfied. Specifically, with respect to the first prong, the court determined that the parties were in agreement that Mallett was an intended beneficiary of the services that the statute required to be provided to all handicapped individuals. As we have demonstrated, in this case, when the statutes and the implementing regulations are read together, it is clear that the DBE program is not an entitlement program that is designed or intended to confer specific benefits directly on the DBEs. No particular DBE is entitled to any specific service or benefit. The statutes and the regulations simply provide that a state must implement a DBE program and establish certain goals to the satisfaction of the Secretary in order to receive federal funding. Provisions designed to "guide the State in structuring its systemwide efforts" may "ultimately benefit individuals who are eligible for . . . services," but they are too indirect to give rise to enforceable rights. Blessing, 117 S. Ct. at 1361.
 In any event, to the extent that Mallett might be read to create a distinction between claims seeking a compliant plan and claims seeking redress for deviations from an otherwise compliant plan, such a distinction is inapplicable in this appeal. The contentions that the plaintiffs bring before us on appeal are properly characterized as challenges to deviations from the plan.
 
 
 [9]
 The plaintiffs do not claim explicitly that the district court erred in its rulings on the issue of standing. To the extent that those plaintiffs who can show "injury in fact" might argue that they also have established the requisite causal nexus between their injury and the policy of the defendants, our discussion in the text demonstrates that they have not shown that any race-based policy of the defendants has caused their injury.
 
 
 [10]
 We note that the data contained in Exhibits 22 and 23 was admitted as Exhibit 2 to Harry Alford's deposition.
 
 
 [11]
 On appeal, the plaintiffs do not argue independently their Title VI claim. We therefore need not address that claim. In any event, our holding that there is no evidence of a specific intent to discriminate would apply as well to such a claim. Nor have the plaintiffs identified evidence of record from which a trier of fact reasonably could find disparate impact.
 
 
 [12]
 The section-by-section analysis of 49 C.F.R. sec. 23.69 provided in the regulations states:
 First, the basic meaning of a presumption of social and economic disadvantage is that the recipient assumes that a member of the designated groups is socially and economically disadvantaged. In making certification decisions, the recipient relies on this presumption, and does not investigate the social and economic status of individuals who fall into one of the presumptive groups.
 49 C.F.R. Pt. 23, App. A to Subpt. D.