## BATTEAST CONSTRUCTION COMPANY INC.,
### Plaintiff,

v.

## HENRY COUNTY BOARD OF COMMISSIONERS, RQAW Corporation, Project Management Services Inc., Defendants.

### No. IP00–1229–C–B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 29, 2002.

---

Stanley E. Niew, Niew and Associates, Oak Brook, IL, for plaintiff.

Terrill D. Albright, Baker & Daniels, Philip D. Burroughs, Cremer Miller & Burroughs, Ronald J. Semler, Stephenson Daly Morow Horn & Semler, Indianapolis, IN, for defendants.

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BARKER, District Judge.

### I. *Introduction.*

This is a race discrimination case brought pursuant to 42 U.S.C. §§ 1981 and

1985. To the extent that it seeks to hold Henry County liable, it seeks to do so through 42 U.S.C. § 1983. The plaintiff, Batteast Construction Company (hereafter Batteast or BCC), an African–American owned construction company, alleges that it submitted the lowest bid on a Henry County construction project, but the County, in consultation with private sector defendants RQAW Corporation (hereafter RQAW) and Project Management Services, Inc. (hereafter PMSI), awarded the contract on the basis of race to a business entity whose ownership is Caucasian.

The case is before us on separate motions for summary judgment filed by all three defendants. For the following reasons, we find that there is legally insufficient evidence to support a reasonable inference that race played a role in Henry County's decision to award the contract to Summit Construction or that the three defendants conspired to deprive Batteast of its civil rights based on race. Accordingly, we GRANT all three motions for summary judgment.

## II. *Statement of Facts.*[1]

The following facts are either undisputed or are stated in a light reasonably most favorable to the plaintiff.

Henry County, Indiana, is governed by a Board of County Commissioners consisting of three individuals. At all times pertinent to this lawsuit, the Commissioners were Donald Shaw, John McGrady, and Philip Estridge. HCSOMF, ¶¶ 1, 2.

The County decided to build a new government annex to add to its available space. The County hired Project Management Services, Inc. (hereafter "PMSI") to provide management services from initial project planning through bidding and construction. It also hired RQAW to provide architectural, engineering and consulting services to design the building and administer the bidding process for the construction of the annex. HCSOMF ¶¶ 3, 4, 5. PMSI and RQAW are private sector, nongovernmental business entities. PMSISOMF ¶ 1; RQAWSOMF ¶ 2.

The Commissioners approved a budget of $8,900,000 for the project. To finance the project it issued bonds. It also issued bidding documents inviting contractors to submit bids for the project and setting forth ground rules for submissions. The bidding documents solicited bids for two prime contracts: one for general construction; the second for mechanical, electrical, plumbing, and environmental systems ("MEP"). HCSOMF ¶¶ 6, 7, 8, Pl. Resp. to Def. ¶ 9; PMSISOMF ¶ 3; RQAWSOMF ¶ 6.

There are two kinds of MEP services: conventional and "performance based." The County was interested in a "performance-based MEP" contract because such a contract would provide guarantees regarding quality and future costs. Nevertheless, the County was willing to consider (and eventually selected) a conventional MEP. Included in the original bidding instructions were four "alternates," aspects of the project that would be desirable if they could be accomplished within the budget. Alternate 1 was a conventional or *non*-performance based MEP. It was added during the bidding process out of a concern that only one contractor, Siemens Building Technology, appeared interested in bidding a performance-based MEP. HCSOMF ¶¶ 10, 12–13.

---

**1.** Pursuant to Local Rule 56.1, the three defendants submitted statements of material fact. Plaintiff responded to each of these statements and also provided a statement of additional material facts. We abbreviate Henry County's statement of material fact as "HCSOMF." RQAW's statement is abbreviated "RQAWSOMF." And Project Management Services, Inc.'s statement is abbreviated "PMSISOMF." We cite plaintiff's statement of additional material facts as Pl. Add. Facts.

Since Alternate 1 was added late in the process, bidding on it was made non-mandatory so as not to discourage bids and thus make the process less competitive. Because the alternate was not mandatory, the County would consider general construction-based bids submitted without the alternate. If, however, the County ultimately made the decision to include Alternate 1 (the performance based MEP) in the project, then the lowest bidder would be determined from those bidders which submitted bids for Alternate 1, as set forth in the bidding instructions. The County still, however, preferred the performance-based MEP contract. HCSOMF ¶ 14; Pl. Add. Facts ¶ 41. The bidding instructions included the following provisions, among others:

Article 5 CONSIDERATION OF BIDS

5.2 REJECTION OF BIDS

The owner shall have the right to reject any or all Bids. A Bid not accompanied by a required bid security or by other data required by the Bidding Documents, or a Bid which is in any way incomplete or irregular is subject to rejection.

5.3 ACCEPTANCE OF BID (AWARD)

5.3.1 It is the intent of the Owner to award a Contract to the lowest qualified Bidder provided the Bid has been submitted in accordance with the requirements of the Bidding Documents and does not exceed the funds available. The Owner shall have the right to waive informalities and irregularities in a Bid received and to accept the Bid which, in the Owner's judgment, is in the Owner's own best interests.

5.3.2 The Owner shall have the right to accept alternates in any order or combination, unless otherwise specifically provided in the bidding documents, and to determine the low bidder on the basis of the sum of the base bid and alternates accepted.

PMSISOMF ¶ 8.

The Commissioners opened the bids on October 19, 1999 in a public meeting. HCSOMF ¶ 16. Nine companies submitted bids for general construction, seven of which also included Alternate No. 1, the conventional MEP. As anticipated, only Siemens, submitted a bid for the performance-based MEP contract. HCSOMF ¶ 17. Plaintiff Batteast Construction submitted the lowest construction-only bid. It did not submit a bid on Alternate No. 1, the standard MEP. In other words, Batteast did not include a bid on the MEP. HCSOMF ¶ 18; Pl. Add. Facts ¶ 43.

The results of this initial bidding process created a problem for the Commissioners. Both the lowest unified bid—Summit's bid, which combined general construction and the conventional (non-performance based) MEP—and the lowest non-unified bid—Batteast's and Siemens's, taken together, which combined the lowest general construction bid and the only performance-based MEP bid—were in excess of the $8,900,000 budget. If the County selected the *performance*-based MEP (Siemens' bid) then the combination of Batteast (for general construction) and Siemens (for the performance-based MEP) was the lowest bidder. If the County selected the *conventional* MEP (Alternate 1), then Summit's bid (which included both general construction and conventional MEP) was lowest. Either combination, however, remained substantially over budget. HCSOMF ¶ 19, 20.

The Commissioners voted to take the bids under advisement, then held another public meeting on October 25, 1999. On that day, consultants RQAW and PMSI outlined the following options to the Commissioners based on the initial bids. The County could:

a. Award separate contracts to Batteast (for construction) and Siemens (for performance based MEP) at a total cost of $10,454,000, about $1,554,000 over budget.

b. Award contracts to the low unified bid of Summit Construction (construction plus conventional MEP) of $9,764,000, which was $864,000 over budget.

c. Award the general contract to the low bidder, Batteast, and rebid the MEP portion of the project.

d. Rebid the entire project.

e. Engage in a "value engineering process" with Batteast, Siemens and Summit to determine if the project could been brought under budget by reducing nonessential items.

HCSOMF ¶ 21; Pl. Resp. To HCSOMF ¶ 21; Pl. Resp. to RQAWSOMF ¶ 24; Pl. Resp. to PMSISOMF ¶ 11.

The Commissioners decided not to award the contract because all of the bid combinations were over the budget. Instead, they decided to pursue value engineering. The Commissioners could, of course, have decided to rebid either the entire project or the MEP portion of it. Commissioner Shaw states that they decided not to take either course of action because the project could be delayed, in which event there was a chance the project would have to be refinanced at a higher rate of interest and also a chance of weather-related delays. HCSOMF ¶ 24 (Shaw Aff., ¶ 24).

Batteast's chief estimator was Marvin Murdock, an African–American. On November 10, 1999, Mr. Murdock met with representatives of RQAW and PMSI for the purpose of value engineering. Siemens was at this meeting; Summit was not. Mr. Murdock noted at this meeting that Batteast was an African–American owned enterprise. Pl. Add. Facts ¶¶ 34, 44. During the value engineering process, Batteast was told that its bid was going to be combined with Siemens. Batteast requested that it be allowed to bid the *conventional* MEP portion of the project, because being combined with Siemens' *performance*-based MRP made its bid higher than the conventional-based MEP bidders. Pl. Add. Facts ¶¶ 46, 52. Its request was denied. After conducting the value engineering, the Commissioners voted in a public meeting on November 12, 1999 to award the contract (construction plus MEP) to Summit. HCSOMF ¶¶ 22–25.

Summit's bid, after value engineering, cost $8,724,643, about $175,000 under budget. After value engineering, the total of Batteast's bid for general construction contract plus Siemens' MEP bid was $9,553,300, about $663,000 over budget. Although the Commissioners would have preferred the performance-based combined bid of Batteast and Siemens because of the *inherent guarantees*, the Commissioners determined that the additional costs were excessive in view of the $8,900,000 budget and the difference between the bids of about $900,000. HCSOMF ¶ 26.

Henry County asserts that neither RQAW nor PMSI made any recommendation as to which contractor(s) should be awarded the project. They merely presented the County with its options. Batteast agrees that RQAW and PMSI presented four options: the County could "award separate contracts to the low-based bids being Batteast and Siemens; (2) award to the lower unified bid of Summit; (3) award the general contract to the low bidder, Batteast, and rebid the MEP; and (4) rebid the entire Project." HCSOMF ¶ 28; Batteast Resp. to ¶ 28. Batteast argues, however, that RQAW and PMSI could have presented additional options: "RQAW and PMSI never told the County that they could have selected Batteast's

general construction bid and the lowest responsive conventional MEP bid or solicit separate conventional MEP bids which would have taken the same amount of time as to rebid the conventional MEP with the general contractors." It concludes that, by limiting the options, RQAW and PMSI discriminated against Batteast on the basis of race. *Id.*

### III. *Discussion*

#### A. *The Standard on Summary Judgment.*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998).

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find

in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505, 91 L.Ed.2d 202).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge,* 24 F.3d at 920. Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant. *Venters v. City of Delphi,* 123 F.3d 956, 962 (7th Cir.1997). If genuine doubts remain, and a reasonable factfinder could find for the party opposing the motion, summary judgment is inappropriate. See *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Waldridge,* 24 F.3d at 920.

#### B. *Batteast's Section 1981 Claim.*

##### 1. *Analysis Under Section 1981.*

Batteast alleges that all three defendants discriminated against it on the basis of race in violation of 42 U.S.C. § 1981 by refusing to enter into the annex construction contract with it notwithstanding that it submitted the lowest construction bid, and, instead, awarded the contract to Summit, a Caucasian owned business. Section 1981(a) (which applies to private as well as some public entities)[2] provides: "All per-

---

**2.** *See Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Monell v. New York City* *Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Smith v. Chica-*

sons ... shall have the same right ... to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." Section 1981(b) adds: "For the purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Section 1981 comprehensively "bars all racial discrimination with respect to making and enforcing contracts." *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1034 (7th Cir.1998).

Although Batteast alleges that all three defendants violated section 1981, the status of the three is quite different. It is undisputed that Henry County's Commissioners were responsible for making the decision as to which contractor(s) would be awarded the annex construction bid and that RQAW and PMSI were the County's consultants in the decisional process. While Henry County's liability would be relatively straightforward, Batteast must present evidence sufficient to raise a reasonable inference that RQAW and PMSI participated in the decision—that is, they either made or influenced the decision-to deny Batteast the contract and that they did so on the basis of race.

■ It is well settled that section 1981 claims are governed by the same analytical proof scheme as Title VII employment discrimination cases. *E.g., Lalvani v. Cook County, Illinois,* 269 F.3d 785, 789 (7th Cir.2001); *Gonzalez,* 133 F.3d at 1035. In cases such as the present one, which involve contracts unrelated to employment, Batteast may establish a *prima facie* case of discrimination by presenting evidence showing that: (a) it is in the class of

persons protected by the statute; (2) the defendants had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (that is, the making, performance, modification, or termination of a contract). *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996). *See Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 671–672 (Fed.Cir.2000); *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993).

If the plaintiff carries its *prima facie* burden of persuasion, a presumption of discrimination arises. The defendant may overcome that presumption by presenting evidence that it had a legitimate non-discriminatory reason for taking the action that adversely affected the plaintiff. If the defendant supplies such evidence, the plaintiff bears the ultimate burden of persuasion to show that the defendant's explanation of its adverse action was pretextual. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

2. *Knowledge Of Batteast's Minority Ownership: RQAW and PMSI.*

■ There are two reasons—each dispositive in itself—as to why defendants RQAW and PMSI are entitled to summary judgment. First, Batteast has presented insufficient evidence to raise a reasonable inference that either knew that Batteast was a minority owned enterprise when they presented their four options to the County. The parties agree that RQAW and PMSI presented the options to the Commissioners on October 25, 1999. HCSOMF ¶ 21; Pl. Resp. To HCSOMF ¶ 21; Pl. Resp. to RQAWSOMF ¶ 24; Pl. Resp. to PMSISOMF ¶ 11. Batteast in-

sists that Mr. Murdock expressly indicated to RQAW and PMSI that Batteast was a minority owned business two weeks *later*, on November 10, 1999. Pl. Add. Facts ¶ 36; Pl. Brief, p. 7. PMSI's CEO, William Shepler, testified that: "At the November 10, 1999 meeting, Mr. Murdock first informed RQAW and PMSI representatives that Batteast was a minority-owned contractor." Shepler Aff., ¶ 39. Obviously, if RQAW and PMSI did not know before October 25 that Batteast was African American owned, then neither *could* have discriminated on the basis of race in outlining options to Henry County.

Batteast offers two arguments to raise an inference that RQAW and PMSI knew prior to October 25, 1999 that the company was African–American owned. First, it sent its representative, Larry Ivory, to hand-deliver its bid to a "representative of Henry County" and Mr. Ivory is black. Who was that "representative" of Henry County? Mr. Ivory testified that he took the bid documents to the Henry County courthouse in Newcastle where he handed them to a secretary. He did not speak to anyone there about the minority ownership of Batteast; nor did he speak to anyone thereafter about the company's racial composition. Ivory Dep., pp. 14–15.

There is no evidence from which one could reasonably infer that this "secretary" was a "representative" of Henry County for purposes of anything other than to receive the bids. But even assuming that he or she was Henry County's "agent," Batteast has not offered any evidence to show that the secretary knew that Mr. Ivory was anyone other than a messenger—a person who could, of course, have been delivering the bid on behalf of a Caucasian owned contractor. Nor is there any evidence that the secretary, knowing that Mr. Ivory was black *and* a member of Batteast management *and* that Batteast management was predominantly African American, then disseminated these facts to RQAW or PMSI. Absent a shred of evidence to indicate that either defendant knew that Batteast was minority owned when they laid out the options to the Henry County Commissioners, we cannot impute to either a motive to intentionally discriminate on the basis of race. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932–33 (7th Cir.1995) (since employer did not know of employee's disability, it could not have taken adverse employment action because of disability); *Geraci v. Moody–Tottrup, Intern., Inc.*, 82 F.3d 578, 581 (3rd Cir.1996) (relying on Hedberg: since employer did not know that employee was pregnant, employer could not have taken adverse action because of employee's pregnancy); *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir.1987) ("An employer cannot intentionally discriminate against a job applicant based on race unless the employer knows the applicant's race.").

Batteast's second argument is that "[i]t is a well established fact throughout the construction industry that Batteast is an African–American owned company." Pl. Add. Facts ¶ 36. The only evidence Batteast offers in support of this proposition, however, is the testimony of the company's owner, Robert V. Batteast. Batteast Dep., 200. This is the kind of self-serving statement, unsupported by the record, that will not preclude summary judgment. *Basith v. Cook County*, 241 F.3d 919, 928 (7th Cir.2001). *See Haywood v. North Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir.1997). Such testimony does little if anything to raise a genuine issue of material fact. *Drake v. Minnesota Mining & Manufacturing Co.*, 134 F.3d 878, 887 (7th Cir.1998).

It may well be true that Batteast is well known in its industry to be a minority owned company. It also may be true that neither RQAW nor PMSI knew that fact.

But the issue is too important to leave to chance in a case requiring proof of intentional discrimination. It is also an issue so readily susceptible of proof—through deposition questions (written or oral) or interrogatories or requests for admission—that the absence of such evidence raises an eyebrow. It was the plaintiff's job to present evidence from which a trier of fact may reasonably infer that RQAW and PMSI knew that Batteast was a minority owned company before October 25, 1999. It did not present such evidence.

### 3. *RQAW's and PMSI's Role in the Decisional Process.*

■ The second reason why RQAW and PMSI are entitled to summary judgment is that there is no evidence tending to show that RQAW or PMSI played any role, other than to outline options to the Commissioners, in making the decision to award the annex contract to Summit. Indeed, Batteast acknowledges that RQAW and PMSI had no decision making authority. PMSISOMF ¶ 19 ("PMSI had no decision-making authority regarding the award of the Annex Project.") and Pl. Resp. ("Admits."). RQAWSOMF ¶ 24 ("Neither RQAW nor PMSI had any decision-making authority regarding the award of the project.) and Pl. Resp. ("Plaintiff admits . . . ."). Batteast argues that RQAW and PMSI "influenced" Henry County's decision by limiting its options:

> However PMSI could and did influence the County when it along with RQAW gave the County the limited options that (1) they could award separate contracts to the low-based bids being Batteast and Siemens; (2) award to the lower unified bid of Summit; (3) award the general contract to the low bidder, Batteast, and rebid the MEP; and (4) rebid the entire Project.

Batteast Rep. to PMSISOMF, ¶ 19 and Resp. to RQAWSOMF, ¶ 24.

From this evidence it is clear that RQAW and PMSI played, at most, a consultative role with respect to Henry County's decision to award the annex contract to Summit. We cannot infer from their mere listing of options that the two participated in the decision in a manner that affected the outcome. Our finding is powerfully supported by the fact that, according to Batteast's own statements, two of the four options that RQAW and PMSI outlined to the Commissioners involved awarding the contract to Batteast: options 1 and 3. A jury could not reasonably infer from these facts that RQAW and PMSI intentionally limited Henry County's options to exclude Batteast at all, much less because of a racial animus against it. In sum, the evidence will not support a finding that RQAW and PMSI were decision makers with respect to the annex contract and could have discriminated on the basis of race by refusing to award the bid to Batteast.

Batteast complains that RQAW and PMSI did not offer Henry County an additional set of alternatives to consider:

> RQAW and PMSI never told the County that they could have selected Batteast's general construction bid and the lowest responsive conventional MEP bid or solicit separate conventional MEP bids which would have taken the same amount of time as to rebid the conventional MEP with the general contractors. These limited option[s] discriminated against Batteast based upon race. *Id.*

*Id.*

As to Batteast's first objection, Joseph Mrak, RQAW's head of architecture, testified unrebutted that the County *could not* have selected Batteast's construction bid and then couple it with the lowest responsible conventional MEP bid because alternative bids (such as the MEP bid) are

proprietary and confidential. Mrak Dep., 122–128. As to its second objection, Batteast's own statements indicate that RQAW and PMSI *did* list the option of soliciting new bids on the MEP part of the contract.

These additional explanations are unnecessary, however, because even if RQAW and PMSI could have offered any number of other options, there is no evidence to support a finding that they did not present such possibilities because of the racial composition of Batteast's ownership.

On these claims, there is no genuine issue of material fact regarding whether RQAW and PMSI discriminated against Batteast on the basis of race. Accordingly, both are entitled to judgment as a matter of law.

4. *Batteast's Section 1981 Claim Against Henry County.*

a. *Henry County's Knowledge of Batteast's Racial Composition.*

■ Like RQAW and PMSI, Henry County asserts that Batteast has presented insufficient evidence to show that the Commissioners knew Batteast's racial composition before making its decision to award the annex contract to Summit. Indeed, the Commissioners' sworn assertions are even stronger. Each of the three testified that:

"At no time prior to the filing of the lawsuit by Batteast did I know Batteast was a minority owned contractor." McGrady Dep., ¶ 27; Estridge Dep., ¶ 27; Shaw Dep., ¶ 27. For the reasons discussed earlier, Batteast's evidence that Mr. Ivory delivered the bid and that Batteast has a well known reputation for being a minority enterprise are inadequate to overcome such specific, conclusive statements. Once again, absent evidence to indicate that the Commissioners knew that Batteast was minority owned, a jury may not reasonably find that Henry County discriminated against the company on the basis of race.

b. *Henry County's Award of the Contract.*

Even if Batteast could clear the first hurdle—an inference that Henry County knew it was a minority owned company—its evidence for the proposition that the Commissioners based their decision on race is legally inadequate.

At the heart of Batteast's claim is that the Commissioners coupled Batteast's lowest construction-only bid with Siemens' performance based MEP. Since Siemens' performance-based MEP was higher than any conventional MEP bid, the effect of the pairing was to make Batteast's bid artificially high. To make matters worse, Batteast neither asked for the pairing nor approved of it. If, as Batteast requested, Batteast's bid had been coupled with an existing *conventional* MEP bid or if the County had solicited *additional* MEP-only bids and paired Batteast's construction-only bid with one of them, then Batteast's bid would likely have been lower.

We are not unsympathetic to Batteast's "apples and oranges" argument. The Commissioners made a choice between Summit's low overall bid (construction plus conventional MEP) and Batteast's (construction-only) plus Siemens' (performance based MEP) bid. Batteast argues that, since Summit got to bid the job with conventional MEP, then it too should have been given the opportunity to get a conventional MEP bid to go along with its lowest general construction bid. It makes a convincing argument that the Commissioners could have been fairer in permitting it to submit an alternative MEP bid. But Batteast's burden is not merely to show that the process was unfair. To prevail on its section 1981 claim, it must

present evidence from which a jury could reasonably infer that Henry County *intentionally* made the choices it made *because of* race. *Sanghvi v. St. Catherine's Hospital,* 258 F.3d 570, 573 (7th Cir.2001); *Eiland v. Trinity Hospital,* 150 F.3d 747, 751 (7th Cir.1998); *Gonzalez v. Ingersoll Milling Mach. Co.,* 133 F.3d 1025, 1031 (7th Cir.1998). Batteast has presented legally insufficient evidence to support a reasonable inference of race discrimination.

■ We will assume for the sake of brevity that Batteast's evidence—having its bid being coupled with Siemens' and thus inflating it—raises an initial inference of discrimination and turn to the pretext analysis. Henry County has explained its award of the annex contract to Summit as a strictly economic decision. After value engineering, Summit's bid cost $8,724,643, about $175,000 under budget. After value engineering, the total of Batteast's bid for general construction contract plus Siemens' MEP bid was $9,553,300, about $663,000 over budget. The Commissioners decided to go with conventional MEP because the additional costs of performance based MEP were excessive in view of the $8,900,000 budget. The difference between the two bids was about $900,000.

Henry County has offered a legitimate, nondiscriminatory explanation of why it awarded the contract to Summit. Batteast must present evidence from which a trier of fact could reasonably infer that the explanation is a pretext. "Pretext" means "a lie" or "a phony reason." *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995). "Pretext means more than an unusual act or a bad business decision; it is a lie or 'deceit used to cover one's tracks.'" *Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 684, 685 (7th Cir. 2000). Batteast presents no evidence to refute Henry County's explanation.

Instead, Batteast implies that a series of choices that the Commissioners made led inevitably to the outcome and that the series of choices was itself based on race. Among the decisions were the following: to pair its bid with Siemens'; not to permit Batteast to use an existing conventional MEP bid or to rebid the entire MEP aspect of the project; and to engage in value engineering with Summit, but not with it. Batteast alleges that Henry County violated industry standards in engaging in value engineering with Summit and that it violated Indiana law by not accepting its bid. But it presents its allegations as self-evident truths, as if they required neither evidence nor argument to support them. Evidence that a County made decisions in violation of accepted standards and statute might well constitute evidence that it was trying to avoid granting the contract to Batteast for some illicit motive. But Batteast has not presented evidence and we have no mandate to speculate on possible motives.

As to the objection that the Commissioners would not pair Batteast's construction bid with an existing conventional MEP bid, we have already cited architect Mrak's testimony that the County could not lawfully do so and Batteast nowhere rebuts that testimony. Similarly, the Commissioners' refusal to solicit new bids on the MEP part of the project cannot, by itself, be viewed as racially motivated. Commissioner Shaw explained that the Commissioners did not want to run the risk of delays associated with the rebidding process because delays could be expensive. Batteast offers no evidence to show how that explanation might be pretextual.

Batteast argues that Henry County "could" have done several things differently. That may well be true. But its burden is to show that what the Commissioners did, they did based on race (or, what amounts to the same thing, that Batteast is a minority owned enterprise). In order for us to second-guess a decision maker's

decision to award a contract, the plaintiff must present evidence justifying an intrusion into the decisional process. *Basith v. Cook County*, 241 F.3d 919, 929 (7th Cir. 2001); *Stalter v. Wal–Mart Stores, Inc.*, 195 F.3d 285, 289–290 (7th Cir.1999).

In sum, Batteast has offered allegations without evidence. It has failed to accomplish what the law requires it to do: to rebut the specific explanations that the defendant has offered to explain its adverse action. *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir.1995). Specifically, it fails to rebut Henry County's race-neutral explanation as to why it engaged in value engineering with Summit and why it would not re-let the MEP project.

### C. *Batteast's Section 1985(3) Claim.*

■ Section 1985 bars conspiracies that interfere with civil rights. To establish a claim under 42 U.S.C. § 1985(3), a plaintiff must demonstrate four elements: (1) a conspiracy; (2) a purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to his person or property or a deprivation of any right or privilege of a citizen of the United States.[3] *Indianapolis Minority Contractors Association, Inc. v. Wiley*, 187 F.3d 743, 754 (7th Cir.1999); *Hernandez v. Joliet Police Department*, 197 F.3d 256, 263 (7th Cir.1999); *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir.1996).

■ Batteast's section 1985(3) claim is fatally deficient in at least two respects. Batteast presents no evidence of a conspir-

acy between or among the defendants and no evidence that any defendant had a purpose of depriving it of its civil rights. We found with respect to Batteast's section 1981 claims that neither RQAW nor PMSI knew that Batteast was a minority owned contractor until after it had outlined its options to Henry County, and that Henry County did not know until the lawsuit was filed. Additionally, RQAW and PMSI affirmatively state that: "No person from either RQAW or PMSI discussed the race of Batteast's majority shareholder or that Batteast was minority owned with any of the County Commissioners at any time before the County made its final decision to award the contract to Summit." RQAWSOMF ¶ 27. Absent any evidence to the contrary, none of the defendants could have engaged in a conspiracy to deprive Batteast of its rights based on race.

Similarly, since there is no evidence to show that RQAW and PMSI played any but a consultative role in the decisional process, they could not have engaged in a conspiracy with Henry County; in which case, Henry County could not have engaged in a conspiracy. In other words, as the Seventh Circuit held in *Wiley*: "As a threshold matter, we note that the absence of any underlying violation of the plaintiffs' rights precludes the possibility of their succeeding on this conspiracy count." 187 F.3d at 754, citing *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir.), *cert. denied*, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988). That is the situation here.

### IV. *Conclusion.*[4]

For the reasons addressed, we find that the plaintiff has failed to raise a genuine

---

**3.** Section 1985(3) provides in relevant part: "If two or more persons in any state or Territory conspire ... for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws ... the party so injured or deprived may

have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3).

**4.** We provide no independent analysis of section 1983 because it is used here only as a

issue of material fact as to its section 1981 or 1983 claims against any of the defendants and that the defendants are entitled to judgment as a matter of law. Accordingly, we GRANT defendants' motions for summary judgment pursuant to Fed. R.Civ.P. 56.

vehicle for asserting Batteast's section 1981 and 1985 claims against a public entity acting under color of state law.